UNITED STATES of America

v.

Dwayne HOLLAND, Daniel Hill, Donnie Montgomery, Duane Carroll, Pirrie Coates, Kevin Jones and James Deberry

No. CRIM. AMD 96–0399.

United States District Court, D. Maryland.

Aug. 31, 1998.

**498**

Martin J. Clark, Assistant United States Attorney, Christine Manuelian, Assistant United States Attorney, Baltimore, MD, for U.S.

Cyril V. Smith and Charles G. Bernstein, Baltimore, MD, for Holland.

Harold I. Glaser, Baltimore, MD, for Hill.

Frederick J. Sullivan, Bowie, MD, for Montgomery.

Jane C. Norman, Washington, DC, for Carroll.

Thanos Kanellakos, Baltimore, MD, for Jones.

Donald Feige, Baltimore, MD, for Deberry.

Godwin Oyewole, Washington, DC, for Coates.

## OPINION

DAVIS, District Judge.

### CONTENTS

I. INTRODUCTION ............................................. 499
II. ELABORATION ON TRIAL RULINGS ................................. 500
 A. THE SIXTH AMENDMENT .................................... 500
 1. October 12 and 14, 1994 Audiotapes ....................... 502
 2. September 4, 1996 Audiotape ............................ 504
 3. Trial testimony ...................................... 509
 a. Independent source ................................ 511
 B. COATES'S MOTION FOR SEVERANCE ......................... 516
III. MOTIONS FOR JUDGMENT OF ACQUITTAL ......................... 517
 A. LOST PHOTOGRAPHS (COUNTS 5, 7 AND 8) .................... 517
 B. ALLEGED INDICTMENT DEFECTS (COUNTS 5 AND 8) ............ 517
IV. MOTIONS FOR NEW TRIALS ON ALL COUNTS ...................... 519
 A. PREJUDICE FROM DEFENDANT KEVIN JONES'S TESTIMONY ..... 519
 B. ALLEGED *BRADY, GIGLIO* AND *GILES* VIOLATIONS .............. 521
V. SENTENCING ISSUES ........................................ 524
 A. DRUG QUANTITY ....................................... 524
 1. Foreseeability ...................................... 524
 a. Government's Computations of Drug Quantity ............ 524
 b. Quantity foreseeable to each defendant ................. 527
 i. Holland .......................................... 527
 ii. Hill ............................................. 528
 iii. Montgomery ...................................... 528
 iv. Carroll .......................................... 528
 v. Jones ........................................... 529
 vi. Deberry ......................................... 529
 vii. Coates .......................................... 529
 2. Periods of Incarceration .............................. 530
 3. Multiple conspiracies ................................ 531
 4. The effect of the Corbin plea agreement as to drug quantity .... 531
 B. ROLE IN THE OFFENSE .................................. 533
 C. CROSS REFERENCE TO U.S.S.G. § 2A1.1 ..................... 534
 D. POSSESSION OF FIREARM ................................ 537
 E. OBSTRUCTION OF JUSTICE ............................... 539
 F. CAREER OFFENDER ..................................... 540
 G. MINIMAL PARTICIPATION ................................ 541
 H. CRIMINAL HISTORY POINTS .............................. 542
 I. SENTENCING CONCLUSIONS .............................. 542

1. Holland ........................................................ 542
2. Hill ........................................................... 543
3. Montgomery .................................................. 543
4. Carroll ....................................................... 543
5. Jones ......................................................... 543
6. Deberry ...................................................... 543
7. Coates ........................................................ 543
VI. CONCLUSION ................................................ 543

## I. INTRODUCTION

The indictment in this case alleged a heroin and crack cocaine ("crack") conspiracy which included among its members defendants Dwayne Holland ("Holland"), Daniel Hill ("Hill"), Donnie Montgomery ("Montgomery"), Duane Carroll ("Carroll"), Kevin Jones ("Jones"), Pirrie Coates ("Coates") and James Deberry ("Deberry"). The indictment alleged that the conspiracy existed from May 1992 until March 1997. The conspiratorial acts allegedly included murder, use of firearms and other acts of violence in connection with illegal drug distribution.

On March 10, 1998, after seven weeks of trial, the jury was asked to render verdicts regarding the following counts: conspiracy to possess with intent to distribute (PWID) and to distribute heroin and crack cocaine against all defendants (count 1);[1] PWID crack (count 10) and PWID crack within proximity of a playground and school (count 11) against Holland and Montgomery; distribution of crack (count 7) and distribution of crack within proximity of a school (count 8) against Holland and Hill; distribution of crack against Holland (count 9); and, murder in a drug conspiracy (count 2) and use of a handgun during a drug trafficking crime (count 5) against Holland.[2]

On March 13, 1998, after several days of deliberations, the jury reached its verdicts.

The jury found Holland not guilty of murder in the course of a drug conspiracy and the dependent handgun charge (counts 2 and 5) and not guilty of one distribution of crack charge (count 9). On all the remaining charges, the jury returned verdicts of guilty as to all defendants.

The defendants filed timely post-trial motions for judgments of acquittal and new trial, which have been thoroughly briefed. *See* Fed.R.Crim.P. 29, 33. Presentence investigation reports ("PSR") have been completed by the probation office, and I have held a consolidated motions hearing and sentencing hearing during which counsel have been heard on all relevant issues. Furthermore, counsel have briefed and have been heard in connection with an alleged *Giglio*[3] violation which came to light after trial.

In Parts II, III and IV of this opinion, I will address the issues presented in the post-trial filings and elaborate on my pre-trial and trial rulings regarding whether and to what extent the government made improper use of information obtained as a result of the interrogations of Holland and Montgomery on October 24, 1996, in conceded violation of their Sixth Amendment right to counsel, other alleged Sixth Amendment violations and my denial of defendant Coates's renewed request for a severance. In Part V, I shall explain my resolution of certain sentencing guidelines issues, including drug quantity, role in the

---

1. Count references are to the second superseding indictment.

2. Prior to trial, the government voluntarily dismissed the Continuing Criminal Enterprise ("CCE") charges (counts 3 and 6) as well as the murder in the course of a CCE charge (count 4), and I granted Hill's motion to sever the charge of possession of a firearm by a

convicted felon (count 13). Thereafter, with the agreement of the government, the count alleging use of a juvenile to distribute narcotics (count 12) was eliminated from the jury's consideration.

3. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

offense, the murder cross reference, firearm possession, obstruction of justice, career offender status and minimal participation. For the reasons set forth here and on the record at the hearing, all requests for post-trial relief are denied. Individual sentencing hearings for each defendant have been calendared, and shall proceed on the basis of the findings and conclusions set forth below.

## II. ELABORATION ON TRIAL RULINGS

### A. THE SIXTH AMENDMENT

Holland's involvement with law enforcement related to this case began in 1993. On February 7, 1993, Antonio Woodson ("Woodson") was shot and killed in the Westport Housing Project ("Westport"), the location of the defendants' drug trafficking activity as alleged in the indictment and proven at trial. In July 1993, Holland was arrested and charged in the Circuit Court for Baltimore City with Woodson's murder. Holland retained counsel. The charge was "nolle prossed" by the Baltimore City State's Attorney's Office in November 1993 for lack of sufficient evidence to prosecute.[4]

Thereafter, in June 1994, the Federal Bureau of Investigation commenced an investigation of Holland. As part of the federal investigation, agents outfitted informant Mannix White ("White") with a body wire and White obtained two tape recordings, on October 12 and October 14, 1994, which captured Holland and others discussing their drug activities. The purpose of these taped conversations was described by the FBI agent who handled White in connection with the October incidents as follows: "Cooperating Witness 'L Cool White is going to speak to several members of the Holland drug group ...

concerning the drug conspiracy and acts of violence[;] .... that's the purpose of this tape." The federal investigation also involved the use of informant Vance Williams ("Williams") to accomplish controlled drug buys. By the spring of 1995, however, despite this successful investigative activity, federal interest in Holland and his organization all but vanished.

Meanwhile, Officer Anthony Barksdale ("Barksdale") of the Baltimore City Police Department ("BCPD") was assigned to uniform patrol in Westport. While on patrol, Barksdale sometimes encountered Holland and the two would engage in "friendly banter." On occasion, Holland would surprise Barksdale with his unanticipated candor regarding drug trafficking and other illegal activities.

On February 8, 1996, Holland and Montgomery were arrested by Baltimore City police, including Barksdale, attendant to the execution of a state-authorized search and seizure warrant at 2628 Maisbury Court in Westport. At the time of the search, police found a number of people in the house and 83 ziplock bags containing crack. For the reasons explained in detail in my prior opinion in this case, *United States v. Holland,* 985 F.Supp. 587, 599–601 (D.Md.1997), I denied defense motions to suppress evidence obtained in connection with the February 8, 1996 seizure. After his arrest, Holland retained counsel, who entered his appearance in state court and appeared on Holland's behalf at his state court preliminary hearing.

Both Holland and Montgomery were charged in Baltimore City Circuit Court in a criminal information with: (1) PWID cocaine; (2) possession of cocaine; (3) conspiracy (with "Tyoi Miller, Crystal Miller, Earl Jones, James Dubbery, and George Matthews")[5] to distribute cocaine; (4) con-

---

**4.** In Maryland, the effect of a *nolle prosequi* "will be to preclude further prosecution on the charging document, or count ... which is nolle prossed. It will not normally prevent a prosecution for the same offense under another charging document or another count."

*Ward v. State,* 290 Md. 76, 101, 427 A.2d 1008, 1022 (1981). Thus, the state or federal government was free to reprosecute Holland for the murder at any time.

**5.** It is not disputed that the "James Duberry" referred to in the criminal information was

spiracy to PWID cocaine; (5) conspiracy to possess cocaine; (6) conspiracy to possess "controlled paraphernalia" in the form of glassine bags, ziplock bags, syringes and a digital scale; (7) possession of "controlled paraphernalia" in the form of glassine bags, ziplock bags, digital scale and quinine; and (8) carrying a handgun. The "date of offense" listed on the information was February 8, 1996. *See* Govt. Supp. Resp. to Defs' Mot. for Hrg. on Tainted Evid., Ex. 1.

During the pendency of the state court charges, federal interest in Holland began anew. A young man facing criminal charges himself, Lavar Redmond, told federal authorities that he was an eyewitness to Holland's murder of Woodson in February 1993. This information jump-started the dormant federal investigation of Holland and his drug distribution organization. The government began again to send Williams to Westport to accomplish controlled buys, and state law enforcement transferred the February 8, 1996, state charges to federal court. As discussed more fully below, federal and state authorities cooperated to send Barksdale into Westport wearing a wire to attempt to preserve on audiotape the types of incriminating statements that Holland sometimes made to Barksdale during their "friendly banter."

On October 23, 1996, a federal grand jury returned the original one count indictment in this case charging Holland and Montgomery with possessing crack with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1), based upon the February 8, 1996, seizures. On October 24, 1996, federal authorities and Baltimore City police (including Detective Hayes Ball and another officer who was involved in

the arrest of Holland and Montgomery on state charges on February 8, 1996) arrested Holland and Montgomery on a warrant issued on the basis of the original indictment in this case. Both Holland and Montgomery were interrogated following their arrests on October 24, 1996, and both made statements to the state officers and federal agents. Detective Ball was present in the interrogation room with Holland and the assembled FBI agents. It is not disputed that Detective Ball knew that Holland was represented by counsel.

Subsequent to the indictment and arrest of Holland and Montgomery on federal charges arising out of the February 8, 1996, search of 2628 Maisbury Court, the federal authorities continued their investigation of Holland's alleged drug distribution organization. In February 1997, the federal grand jury returned the first superseding indictment in this case, which added several defendants and several charges, including a count alleging that Holland committed the 1993 murder of Antonio Woodson. In September 1997, the grand jury returned the second superseding indictment in this case, adding a defendant and more charges.

Holland and Montgomery filed pre-trial motions to suppress the statements taken by federal and state authorities after their arrests on October 24, 1996, arguing that they were taken in violation of the Fifth and Sixth Amendments. The government conceded that Holland and Montgomery's Sixth Amendment right to counsel had attached in connection with prosecution of the same charges in state court at the time they gave their statements to state and federal authorities on October 24, 1996. The government presented no opposition to the motion to suppress.[6] Accordingly, I

---

the James Deberry on trial in this case. The spelling of "Duberry" is simply a scrivener's error.

**6.** Specifically, the government indicated:

After a review of the applicable law cited by both Defendants, the government finds that when both Defendants were questioned by

state and federal agents on October 24, 1996, the Defendants' Sixth Amendment right to counsel had already attached as a result of their arraignment on the same charges in the state judicial system. The government will present no opposition to the Court's granting of the Defendants' motion to suppress statements, and an eviden-

granted defendants' motions to suppress their October 24, 1996, statements, finding that their Sixth Amendment rights were violated when they were interrogated in connection with the same charges, albeit brought by a different sovereign, to which their Sixth Amendment right to counsel had attached at their state court arraignments.

Thereafter, Holland raised the issue of whether any impermissible use of his statements had been made by law enforcement and to what extent, if any, evidence later obtained was "tainted fruit" of the concededly poisonous tree which must be suppressed. Additionally, when the government sought to use, contrary to its earlier-stated intention, see note 6 supra, excerpts from the September 4, 1996, audiotaped conversation between Holland and Barksdale, Holland moved to suppress that statement as well. Holland also moved to exclude the October 12 and 14, 1994, audiotapes procured through informant White, arguing that they were taken in violation of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

I ruled pre-trial that the September 4, 1996, audiotape must be suppressed because it was taken in violation of Holland's Sixth Amendment right to counsel. I reserved any final ruling on the taint issue until counsel had an opportunity to voir dire relevant witnesses regarding the impact, if any, Holland's statement had upon them and their participation as witnesses for the prosecution. I further ruled that the October 12 and 14, 1994, tapes were admissible because the nolle prosequi of Holland's 1993 state murder charge terminated his Sixth Amendment right to counsel. I shall elaborate on my rulings here.

1. *October 12 and 14, 1994 Audiotapes* [7]

■ Holland moved to suppress the October 12 and October 14, 1994, tapes because, he argued, at the time they were made, Holland had a Sixth Amendment right to counsel under Massiah which attached in 1993 and had not terminated.

It was undisputed that Holland's right to counsel attached after he was charged with the murder of Woodson in July 1993 in state court, that the murder charge in the federal case addressed exactly the same conduct as the murder charge in state court, and that federal authorities knew of the failed state court prosecution of Holland for the murder at the time they were investigating him in connection with the federal case. The issue presented was whether the nolle prosequi entered in

---

tiary hearing on this matter will not be necessary.

Govt. Resp. to Defs' Mot. to Suppress at 1. The government again commented on the issue of defendants' statements in its consolidated motions response, filed August 20, 1997. In that memorandum, the government mistakenly referred to "Hill" instead of Montgomery. Nevertheless, the concession of a Sixth Amendment violation is reiterated:

In January and February, 1997, respectively defendants Holland and Hill filed their initial motions to suppress statements made by them to law enforcement. In its response to those motions, filed February 24, 1997, and incorporated herein by reference, the government indicated that it did not intend to use in its case-in-chief the statements made by Holland and Hill to law enforcement officers on October 24, 1996. The government also has no intention of using in its case-in-chief statements made

by Holland to a law enforcement officer on September 4, 1996.

Govt. Consol. Mot. Resp. at 66–67.

7. Holland moves for a new trial based on my denial of his motion to suppress these audiotapes as well. For the reasons set forth in text, the motion for a new trial on this basis is likewise denied. I note, however, that the October 12 and 14, 1994, audiotapes were pivotal pieces of evidence in this case. They captured Holland and other members of the conspiracy in highly incriminating discussions about drug activity, including discussions of marketing strategies, details of how to "cut" heroin, getting drugs from New York and use of guns and other violence. Although patently critical to the jury's verdict, the importance of these tapes to the verdict was underscored by their repeated requests to hear these tapes during their deliberations.

state court dissolved Holland's right to counsel and therefore permitted the government to obtain information from him without the benefit of counsel. The government's view was that, absent bad faith on its part, the *nolle prosequi* of the state murder charge terminated Holland's right to counsel. Holland's view was that his Sixth Amendment right to counsel on the murder charge continued to provide him with a protective curtain against the deliberate elicitation of information by government agents despite the *nolle prosequi*.

It is clear that covert questioning of a defendant "from and after the finding of an indictment without the protection afforded by the presence of counsel," is violative of the Sixth Amendment right to counsel. *Massiah*, 377 U.S. at 205, 84 S.Ct. 1199. The question presented here was whether Holland's Sixth Amendment right to counsel survived the state *nolle prosequi* of its murder charge.

I found the reasoning of the Ninth Circuit in *United States v. Martinez*, 972 F.2d 1100 (9th Cir.1992), helpful. Martinez was charged in state court with, *inter alia*, possession of a firearm by a convicted felon. *Id.* at 1101. His Sixth Amendment right to counsel attached, but the state charges were dismissed. *Id.* at 1101–02. After the state charges were dismissed, a federal criminal complaint was filed against Martinez alleging possession of a firearm by a convicted felon based upon the same facts as the dismissed state charge. Federal authorities interrogated Martinez and he admitted that he had knowingly purchased the handgun. *Id.* At the trial on the federal charges, Martinez moved to suppress the statement made to federal authorities.

The government argued, as it did here, that "because there were no pending charges against Martinez [at the time of the interrogation by federal agents], he was not 'facing a state apparatus that ha[d] been geared up to prosecute him,' ... and therefore, he had no Sixth Amendment right to counsel." *Id.* at 1104 (inter-

nal citation omitted). Martinez argued that "once a defendant has been charged, he may not thereafter be interrogated about the subject matter of those charges unless his counsel is present." *Id.*

In rejecting the defense position, the Ninth Circuit stated that it was:

reluctant ... to extend [the Sixth Amendment right to counsel] indefinitely into the future after the initial charge is dismissed. To do so would extend the prohibition on interrogation outside the presence of counsel to any investigation of a given set of acts, even if the second investigating unit had no connection to the first. It would require suppression of a statement given to federal authorities regarding a federal crime, if, unbeknownst to the federal agents, the suspect had been charged for the same substantive act at some earlier time. Such a broad prophylactic application of the Sixth Amendment runs counter to the reasoning of *Moulton* and *McNeil*, which stressed both the narrow application of the Sixth Amendment right to counsel and the importance of allowing police to initiate and pursue investigations.

*Id.* at 1104–1105. The court reasoned, however, that if the dismissal of the state charges or the initiation of the federal interrogation was a "mutual endeavor in anticipation of a federal prosecution," then Martinez's Sixth Amendment right to counsel was impermissibly circumvented. *Id.* at 1105. The court elaborated, stating:

[h]e was prosecuted on a charge identical to that of the state, using a statement that the state could not have secured from him if it had proceeded with its prosecution. The key, of course, is the extent of coordination between the state and federal authorities.

*Id.* at 1105. The court then vacated the order of the district court and remanded the case to that court for further factfinding on the issue of the extent of coordina-

tion between the federal and state authorities. *Id.* at 1106.[8]

■■■ I found the reasoning of *Martinez* persuasive. The Sixth Amendment right to counsel on a particular charge should not extend in perpetuity after a dismissal without prejudice of the charge. On the contrary, the continuation of the Sixth Amendment right after dismissal or *nolle prosequi* of the original charges is only warranted to protect against a deliberate, "mutual endeavor" on the part of the state and federal authorities aimed at dismissing an original charge so that an incriminating statement can be obtained for use in a subsequent prosecution by a different sovereign. Mere knowledge of a prior, concluded prosecution by a separate sovereign, in which federal authorities were not involved, does not constitute "collusion" sufficient to extend the Sixth Amendment right to counsel to the new federal investigation.

There was no evidence in this case that the federal authorities participated in the state decision to "nolle pros" the state murder charge in 1993 or that the state and federal authorities communicated during that time period regarding the forum in which Holland should be prosecuted. The record reflected that the FBI began investigating Holland only after the state court prosecution of Holland on the murder case had ended; FBI Special Agent Harrigan testified that the FBI began investigating Holland's activities in June 1994. FBI Special Agent David Hedges testified that not until the summer of 1994 were Williams and White enlisted as confidential informants in the Holland investigation. The record was bereft of evidence that state authorities had any input into or knowledge of White's covert recordings of Holland in October 1994.

Moreover, there was no evidence that at the time of the recordings at issue there was any cooperation at all between federal and state authorities regarding Holland. Only when FBI Special Agent Butch Hodgson was assigned to the BCPD Homicide Unit's Cold Case Squad in February 1996 did the state and federal authorities begin cooperating in the investigation of Holland. Indeed, prior to February 1996, it appeared that there was outright competition between state officers and federal agents over investigatory priority of the Holland drug organization. Accordingly, I found that there was no collusion between the federal and state authorities in an effort to circumvent Holland's Sixth Amendment right to counsel which would operate to resurrect that right after it was extinguished by the state *nolle prosequi* of its murder charge in November 1993. Holland's motion to suppress the October 12 and 14, 1994, audiotapes was therefore denied.

### 2. *September 4, 1996 Audiotape*

Holland argued that the September 4, 1996, audiotape of Holland's discussion with Barksdale must be suppressed because Holland's right to counsel had attached in connection with his state court charges arising from the execution of the search warrant on February 8, 1996. The government's position was that "the circumstances surrounding the custodial interrogation of both Holland and Montgomery on October 24, 1996, following their federal indictment are constitutionally distinguishable from talking with Holland 'on the street' about ongoing criminal activities and other crimes prior to his federal indictment for those crimes, which [in] this case would be murder, a multi-year drug conspiracy and related substantive of-

---

**8.** The court suggested that some areas of fact-finding which would be appropriate would include:

the degree of federal participation, if any, in the state's decision to dismiss its charges; the degree of state participation, if any, in

the decision of federal officers to interrogate and charge Martinez; and the degree of joint decisionmaking over the forum in which Martinez should be prosecuted. *Id.* at 1106.

fenses." Govt. Supp. Mem. in Resp. to Defs' Mot. for Hrg. on Tainted Evid. at 5.[9]

Prior to Holland's arrest on state charges on February 8, 1996, Barksdale would encounter Holland in the Westport area, and they would engage in conversation. These encounters continued after Holland was released on bail by the state court in February 1996. During these encounters, the government asserted, Holland made comments indicating remorse for murders and explaining the relevance of wearing a "black hoody."[10] Sometime after Holland's release in February 1996, the federal authorities were informed of Holland's comments to Barksdale.

On September 4, 1996, after being informed of the nature of comments made by Holland to Barksdale, federal agents placed a body wire on Barksdale. He and his partner, Detective Carpon, each in uniform, then approached Holland on the street in Westport and initiated conversation. The purpose of the interrogation, as stated by Agent Harrigan and reflected on the audiotape, was to have Barksdale "discuss ... details of drug distribution activities" with Holland. Barksdale stated on the tape that he was "about to make conversation with the defendant, Mr. Holland." Def's Reply Mem. in Supp. of Req. for Hrg. on Tainted Evid. at Ex. 1, p. 1. Topics of discussion preserved on the audiotape included why Holland was wearing a "black hoody," Holland's alleged involve-

ment in acts of violence, where Holland lived and whether drugs were stored there. Neither officer questioned Holland directly about the February 8, 1996, drug seizure, arrest or the (still pending) subsequent charges. In response to another question, however, Holland stated, "I'm just gettin' ready for Court man. You know man? Seriously man." Govt. Supp. Mem. in Resp. to Def's Mot. for Hrg. on Tainted Evid. at Ex. 3, p. 4.[11]

My analysis of Holland's Sixth Amendment right to counsel compelled the conclusion that the September 4, 1996, audiotape should be suppressed. The Sixth Amendment right to counsel prohibits the government from eliciting incriminating evidence from an accused "after he ha[s] been indicted and in the absence of his counsel." *Massiah*, 377 U.S. at 206, 84 S.Ct. 1199. However, the Sixth Amendment right to counsel is offense specific; "[i]t cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced ...." *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). Investigation of new charges or continuing charges is constitutionally permitted despite attachment of the Sixth Amendment right to charged conduct. *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985).[12] However, in *Moulton*, the court held:

**9.** The government asserted that after Holland's release on bail on February 9, 1996, after his arrest the day before on state drug charges, he returned to the Westport area and continued to engage in criminal activities related to his drug organization. The jury found this allegation to be accurate.

**10.** The government's theory was that during the recent generations of drug organizations in Westport, when a participant prepared to commit a violent act in connection with the drug organization, he would don a black hooded jacket. The jacket was referred to by members of the organization as a "black hoody."

**11.** At the time of this conversation between Holland and Barksdale, the state charges re-

sulting from the search of 2628 Maisbury Court on February 8, 1996, were still pending.

**12.** In *Moulton*, the court reasoned:

The police have an interest ... in investigating new or additional crimes [after a defendant is formally charged with a crime] .... [T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities.

*Id.* at 179–80, 106 S.Ct. 477.

incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel.

*Id.* at 180. When the police obtain incriminating statements pertaining to a crime to which the Sixth Amendment right has not attached, those statements are admissible at a trial "of those offenses." *Id.* at 180, n. 16. By implication, therefore, incriminating statements regarding charges to which the Sixth Amendment has not yet attached are not admissible at a *joint trial* of those charges with the charges to which the Sixth Amendment has attached.

This "related offense" exception to the "offense specific" gloss on the Sixth Amendment right to counsel guarantee expands its protective curtain under certain circumstances. The Fourth Circuit has recognized the "related offense" exception to the offense specific nature of the Sixth

Amendment. *United States v. Kidd,* 12 F.3d 30, 33 (4th Cir.1993), *cert. denied,* 511 U.S. 1059, 114 S.Ct. 1629, 128 L.Ed.2d 352 (1994); *see also United States v. Arnold,* 106 F.3d 37, 41–42 (3d Cir.1997)(holding that witness intimidation charge closely related to, or "inextricably intertwined" with, uncharged offense of attempted murder of same witness); *United States v. Hines,* 963 F.2d 255, 257–58 (9th Cir. 1992)(charges of possession of unregistered firearms relating to conduct occurring over two months were not inextricably intertwined with similar state charges based on activities of one of the two months encompassed in the federal case).

 The "related offense" exception applies if the offense being investigated derives from the same factual predicate as the previously charged offense. *Kidd,* 12 F.3d at 33. In determining if the offenses are derived from the same factual predicate, the court should look to similarities in time, place, person and conduct. *Id.* at 33.[13] Application of the "related offense" doctrine here is straightforward. The conspiracy charged in state court arising

**13.** After I ruled that the September 4, 1996, audiotape was inadmissible, the Fourth Circuit decided *United States v. Melgar,* 139 F.3d 1005 (4th Cir.1998). In that case, state charges of possession of a concealed firearm, possession of marijuana and possession of a fictitious government identification card were held to be identical to federal charges of possession of a firearm by an illegal alien, possession of marijuana, and possession of a fraudulent identification and the Fourth Circuit determined that the federal interrogation produced incriminating evidence for the pending charge which could not be used in the trial of that charge. *Id.* at 1016. Therefore, the denial of the defendant's motion to suppress was reversible error, however, the Court held that the error was harmless. *Id.*

The Court stated that in addition to looking to time, place, person and conduct to determine whether offenses are derived from the same factual predicate, the court must also determine whether "the interrogation on the new offenses produced incriminating evidence as to the previously charged offenses." *Id.* at 1015. The Fourth Circuit elaborated regarding what it considered "incriminating," citing with approval the Supreme Court's de-

termination in *Rhode Island v. Innis,* 446 U.S. 291, 301 n. 5, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), that " 'incriminating' for Fifth Amendment purposes includes 'any response [from the defendant]—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial." *Melgar,* 139 F.3d at 1015. Thus, *Melgar's* reasoning supports my initial ruling that the September 4, 1996, tape must be suppressed.

Although the government sought to introduce the statements taken on September 4, 1996, as support for the murder aspect of its prosecution, because that prosecution was joined with the previously-charged February 8, 1996, offenses, the government also sought to use the statements in the trial of the February 8, 1996, offenses. As discussed in text, therein lies the problem. Had the government sought to introduce that September 4, 1996, statement in a trial of the Woodson murder which was not joined with the February 8, 1996, substantive offenses, I would have found it constitutionally permissible because, as discussed *supra,* the Sixth Amendment right regarding the murder was extinguished in September 1996.

out of the events of February 8, 1996, has several of the same characteristics as the conspiracy charged in the instant indictment.[14] Although the federal indictment charges a much broader time frame of conspiratorial activity (May 1992 to March 1997), the conspiracy charged in connection with the February 8, 1996, arrest is within the broader time frame. Additionally, the events of February 8, 1996, took place in the same geographic area, namely Westport and 2628 Maisbury Court, as many of the events alleged in the federal indictment and established by the evidence at trial. Furthermore, some of the same people were involved in each conspiracy: Deberry, Montgomery and Holland are named as coconspirators in the state court information and they, in addition to other alleged members, were named in the federal indictment. Finally, the conduct alleged in each case is quite similar, if not identical. The federal indictment alleges that Holland, Montgomery, Deberry and others "used different ... houses in Baltimore, Maryland, to cut their narcotics and to stash and secrete their drugs, drug proceeds, firearms, and other drug paraphernalia, including ... a number of residences located in the 2600 block of Maisbury Court ...." Ind. at ¶ 3(b). The federal indictment further alleged that Deberry and Montgomery "distributed the heroin and cocaine on the street." Ind. at ¶ 3(d). The events of February 8, 1996, constitute the same conduct, albeit not *all* of the same conduct, as that alleged in the federal indictment in this case.[15] Despite that the state charges

14. The government suggests that "the analysis of whether state and federal charges are 'inextricably intertwined' for purposes of the Sixth Amendment is no different than that utilized to determine whether or not there has been an impermissible dual prosecution." *See United States v. Annabi,* 771 F.2d 670 (2d Cir.1985)(defendant not entitled to protection against subsequent prosection on indictment for larger conspiracy where more limited indictment of one day conspiracy and substantive counts dismissed in another district); *United States v. Byars,* 762 F.Supp. 1235, 1240–42 (E.D.Va.1991)(broader federal conspiracy indictment of more defendants following dismissal of state prosecution for same acts did not constitute impermissible dual prosecution). *See also United States v. Aleman,* 855 F.Supp. 117 (M.D.N.C.1994)(for double jeopardy purposes conspiracy count charging one day conspiracy to possess marijuana with intent to distribute not same offense as multi-year conspiracy to distribute cocaine and marijuana which encompassed the one day offense), *aff'd,* 33 F.3d 53 (4th Cir.1994)(unpublished); *United States v. Hoyte,* 51 F.3d 1239, 1245–46 (4th Cir.)(for double jeopardy purposes two day conspiracy not same conspiracy as subsequently indicted multi-year conspiracy that included earlier charged conduct as an overt act), *cert. denied,* 516 U.S. 935, 116 S.Ct. 346, 133 L.Ed.2d 242 (1995).

Even if I were to apply the double jeopardy caselaw to the Sixth Amendment violation alleged here, and find that the February 8, 1996, conspiracy was a one-day conspiracy which was distinct from the broader five-year conspiracy alleged in the indictment, for the reasons stated in text I still would not permit use of post-February 8, 1996, statements in the joint trial of any charges for which the government also endeavored to establish guilt for the February 8, 1996, offenses. *Moulton,* 474 U.S. at 180, n. 16, 106 S.Ct. 477; *Kidd,* 12 F.3d at 33, n. 2.

15. The government relies heavily on *United States v. Kidd,* 12 F.3d 30, 32 (4th Cir.1993), *cert. denied,* 511 U.S. 1059, 114 S.Ct. 1629, 128 L.Ed.2d 352 (1994). In *Kidd,* the Fourth Circuit relied on *Moulton* and *McNeil* to hold that a defendant's post-indictment statements to police about drug law violations were not impermissibly acquired just because he was released on bail about a month earlier on the charge of conspiracy to distribute narcotics and that the activities described in those statements could be considered "relevant conduct" for sentencing purposes.

Federal authorities began investigating Kidd in November of 1991. *Id.* at 31. After informants made seven purchases of crack from him he was indicted on one count of conspiracy to distribute crack in May 1992 and five substantive counts of crack possession and distribution. He was arrested on July 3, 1992. *Id.* Three days later, counsel was appointed and Kidd was released on bail.

On August 26, 1992, a different informant approached him and made a tape-recorded purchase of more crack. *Id.* at 32. The government used this sale to obtain a superseding indictment which extended the con-

arising from the February 8, 1996, appear to be narrower in time, participants, location and scope of conduct than the indictment in this case, the fact that the instant conspiracy completely subsumed the events of February 8, 1996, contributed to my finding that they were "related offenses" which were "inextricably intertwined." [16] This finding required that the Sixth Amendment right to counsel apply with respect to any interrogation of Holland or Montgomery in connection with the drug conspiracy after February 8, 1996.[17]

spiracy to August 26, 1992, and included the latter transaction as a separate count. *Id.*

Kidd argued on appeal that his Sixth Amendment rights had been violated when the government initiated contact with him to buy more crack after he had been indicted on drug conspiracy and distribution charges and counsel had been appointed. *Id.* The Court found that the defendant's Sixth Amendment right to counsel had not been violated by the government's surreptitious recordings:

> As of August 26, 1992, Kidd's right to counsel had attached only with respect to the drug distribution and conspiracy offenses for which he had been indicted. The government did not attempt to elicit, and did not receive, information regarding these offenses during the August 26 transaction .... [T]he government was investigating Kidd's new criminal activity in an effort to obtain information regarding an offense for which no charge had yet been filed, and thus for which no Sixth Amendment right had been invoked.

*Id.* at 32–33 (citations omitted). The Court went on to state:

> The fact that the [first] indictment contained a conspiracy charge does not change our conclusion that the August 26 investigation did not involve any pending charges. The time period for the pending conspiracy charge expired in May 1992, three months before the post-indictment offense occurred.

*Id.* at 33, n. 1.

Nevertheless, the Court's finding that the "related offense" exception to the Sixth Amendment did not apply was essentially fact-driven and its implications in this case are thereby limited. The Court based its ruling on its determination that:

> although the August 26 transaction involved the same type of crime as the charged offenses, it involved a different purchaser-informant, occurred at a different time, and took place in a different location. *In short, the August 26 offense was factually distinct from, and independent of, the prior distribution offenses for which the Sixth Amendment right had been invoked.*

*Id.* at 33 (emphasis added). Moreover, the Court cautioned:

> Because Kidd pled guilty in this case, there was no occasion for the government to use

any evidence regarding his August 26 activities at a trial on the offenses for which Kidd earlier had been charged. Our holding does not imply that such a use would be permissible. *See Moulton,* 474 U.S. at 180, 106 S.Ct. at 489 (prohibiting use of statements obtained after indictment in the absence of counsel "at the trial of those charges")(emphasis added).

*Id.* at n. 2.

16. My finding that the state prosecution arising from the February 8, 1996, incident and the instant prosecution are inextricably intertwined is buttressed by the government's election not to separate the February 8, 1996, charges from the trial of the instant conspiracy. When I informed the government of my oral ruling, I indicated that the government could proceed to trial without the evidence and substantive counts related to the February 8, 1996, and thereby permit use of the post-February 8, 1996, statements in the conspiracy trial. For its own reasons, the government declined to do so and was thereby prevented from using the post-February 8, 1996, statements at trial.

It should be noted that the government has not hesitated to proceed piecemeal when it suits its purposes. Carroll and Coates were tried on the August 20, 1996, substantive offense of distribution of heroin before the Honorable Herbert N. Maletz of this court in January 1997. Nevertheless, the government indicted Carroll and Coates in February 1997 for the instant conspiracy and charged the August 20, 1996, incident as an overt act. *See Holland,* 985 F.Supp. at 591–93 (rejecting double jeopardy claims).

17. In the government's response to Holland's motion for a new trial, it suggests that the court specifically suppressed the five pages of statements listed therein. Govt. Resp. to Def's Mot. New Trial at 6–11. I note, however, that during argument on this issue, the government indicated that the only post-February 8, 1996, statement which it sought to use at trial was the September 4, 1996, reference to the "black hoody." Although, as indicated in text, my ruling would have extended to any post-February 8, 1996, statement taken in violation of the Sixth Amendment as I have

As stated above, "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached are, ... admissible at a trial *of those offenses.*" *Moulton,* 474 U.S. at 180, n. 16, 106 S.Ct. 477 (emphasis added). This presumes, of course, that the trial of the later offenses is not also the trial of the offenses to which the Sixth Amendment right attached. *See United States v. Nocella,* 849 F.2d 33, 37 (1st Cir.1988)(statements obtained during investigation of "new" crimes admissible in trial of those charges, but not in trial of "old" charges to which Sixth Amendment right had attached); *United States v. DeVillio,* 983 F.2d 1185, 1191 (2d Cir.1993)(incriminating statements related to both charged and uncharged offenses did not taint admissibility of statements relating to uncharged offenses at trial *of those offenses* )(cited with approval in *United States v. Neely,* Docket No. 94–5107 at p. 4, 1996 WL 60329 (4th Cir. February 13, 1996)(unpublished)).

Had the government elected to try the February 8, 1996, substantive charges separate from the broader charged conspiracy, the statements made by Holland would have been admissible in the trial of the broader charged conspiracy. The post-February 8, 1996, statements are inadmissible only in the trial of the February 8, 1996, charge. By including the February 8, 1996, offense as a substantive count in this indictment and seeking to rely on the February 8, 1996, evidence to prove the broader conspiracy at trial, the government elected to forego the use the statements at trial. Accordingly, for purposes of the trial before me, suppression of Holland's September 4, 1996, statement was appropriate.

### 3. *Trial testimony*

■ The exclusionary rule applies not only to illegally obtained evidence itself,

"but also to other incriminating evidence derived from the primary evidence," commonly referred to as "the fruit of the poisonous tree." *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Nix v. Williams,* 467 U.S. 431, 441, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Where a Sixth Amendment violation occurs, the issue becomes "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ A threshold question in this case is what analytical framework applies to resolution of the taint issue. The defense urged that I apply the principles of *United States v. North,* 910 F.2d 843, *as amended,* 920 F.2d 940 (D.C.Cir.1990), *cert. denied,* 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). In *North,* the court set forth a detailed procedure for determining whether a prosecution had been tainted by the use of immunized testimony.[18] In order to determine the extent of the witnesses' exposure to the illegal evidence, Holland argued, this court must hold a full hearing to "inquire into the content as well as the sources of the grand jury and trial witnesses' testimony." *North,* 910 F.2d at 872. "That inquiry must proceed witness-by-witness; if necessary, .... line-by-line and item-by-item." *Id.* Specifically:

[f]or each grand jury and trial witness, the prosection must show by a preponderance of the evidence that no use whatsoever was made of any of the [illegally obtained evidence] ... either by the witness or by the [prosecution] ... in questioning the witness. This burden

---

found it to apply in this case, the government sought only to introduce the "black hoody" statements and, accordingly, that is the only statement that I expressly suppressed pre-trial.

**18.** Holland notes that the Fourth Circuit cited *North* approvingly in *United States v. Harris,* 973 F.2d 333, 337 (4th Cir.1992). Like *North, Harris* addressed the use of immunized testimony.

may be met by establishing that the witness was never exposed to [the illegally obtained evidence] ..., or that the allegedly tainted testimony contains no evidence not "canned" by the prosection before such exposure occurred. Unless the District Court can make express findings that the government has carried this heavy burden as to the content of all of the testimony of each witness, that testimony cannot survive the ... test.

*Id.* at 872–73. Moreover, if it proves impossible to separate the witnesses' untainted testimony from that tainted by exposure, then the government may not proceed with the prosecution. *Id.* at 862.

Holland argued that the constitutional prohibition extended far beyond merely presenting the immunized testimony to the grand or petit jury. He argued that taint includes not only any "investigatory lead[s]" provided by such testimony, but also refers to the "use of any evidence obtained by focusing investigation on a witness as a result of the compelled disclosures." *Harris,* 973 F.2d at 336–37 (*quoting Kastigar,* 406 U.S. at 460, 92 S.Ct. 1653). Moreover, Holland argued, taint exists if the evidence has been made available to refresh witnesses' testimony, to focus their thoughts, to organize their tes-

timony, or to alter their prior or contemporaneous statements. *North,* 910 F.2d at 860. Indeed, according to *North,* the substantive content of the witnesses' testimony cannot have been "shaped, altered, or affected" by the illegal evidence in any way. *Id.* at 863; *accord United States v. Poindexter,* 951 F.2d 369, 373 (D.C.Cir. 1991), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 656, 121 L.Ed.2d 583 (1992). Thus, this prohibited use does not mean "a whole lot of use," or "excessive use," or "primary use": " '*any* use', direct or indirect" is prohibited. *North,* 910 F.2d at 861 (emphasis in original).[19]

The government asserted that "the application of *North* is misplaced given that it is a Fifth Amendment case involving the use of immunized testimony to which the exclusionary rule does not apply."

[W]hat is prohibited and unconstitutional under the Fifth Amendment and *Kastigar* is the very presentation of the immunized testimony. Where immunized testimony is used before a grand jury, the prohibited act is simultaneous and coterminous with the presentation; indeed, they are one in the same. There is no independent violation that can be remedied by a device such as the exclusionary rule: the grand jury process itself is violated and corrupted, and the

**19.** Holland argued before trial and now reiterates his contentions that the trial testimony of the following five prosecution witnesses is traceable to Holland's unconstitutional interrogation on October 24, 1996:

1. Steven Jones
Holland argued that Harrigan used information obtained during Holland's interrogation to shape and mold Steven Jones's testimony.

2. Colethar Gilliam
Holland argued that the information learned from Colethar Gilliam regarding drug purchasing trips to New York she took with Holland was obtained by illegal use of Holland's statement, that my limiting instruction was insufficient to cure the illegality and that the evidence should instead have been suppressed.

3. Beverly Davis
Holland argued that Davis only agreed to cooperate after she knew Holland had "coop-

erated" with the government. She was asked about Holland's girlfriends and about Corbin and Lambert and about Corbin's role in the death of Duane Coleman, all subjects on which Holland had been interrogated.

4. Antonio Curtis
Holland argued that Curtis was asked about Corbin, Lambert, Melvin Rust shooting Tommy, Holland's girlfriends, Renaldo/Nardo, Giggles, Corbin's role in the death of Duane Coleman, whether Mannix White killed Horton, whether Horton killed Antwain, about Troy Washington and Ronald Hammond, all of which were subjects mentioned in Holland's statement.

5. Larry Lambert
Holland argued that his statement informed the government that Tammy Baker was his girlfriend and this information was used to "flip" Lambert, a competitor of Holland for Baker's affection.

indictment becomes indistinguishable from the constitutional and statutory transgression.

*North,* 910 F.2d at 869. Unlike the Fifth Amendment transgression in *North,* the Sixth Amendment violation in this case is subject to the "cure" of the exclusionary rule. In other words, it is possible to separate the violation from the evidence developed independently or through lawful means. Likewise, the government argued, *Harris* involved improper use of immunized testimony and is therefore inapplicable.

The government argues that whether the objectionable evidence is "sufficiently distinguishable" turns on the application of one or more of three exceptions to the exclusionary rule: 1) whether the evidence was derived from a source independent of the illegal conduct, *see Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920); 2) whether the evidence would have been inevitably discovered by lawful means, *see Nix,* 467 U.S. at 444, 104 S.Ct. 2501; or, 3) whether the causal connection between the constitutional violation and the evidence is so attenuated as to dissipate the taint, *see United States v. Ceccolini,* 435 U.S. 268, 276, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). I agree with the government's contention that the independent source doctrine applies to the question of whether taint flowed from the Sixth Amendment violation which, it concedes, marred this prosecution.

### a. *Independent source*

Tainted evidence will be admissible if the government can show, by a preponderance of the evidence, that it was derived from a lawful source which was independent of the illegal conduct. *Murray v. United States,* 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); *Nix,* 467 U.S. at 443, 104 S.Ct. 2501 (noting that the doctrine strikes a balance between the interests of society and the police by putting the police in the same, not a worse, position than they would have been in had there been no misconduct). *See also Hamilton v. Nix,* 809 F.2d 463, 465 (8th Cir.), *cert. denied,* 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987)("The critical inquiry under the independent source doctrine is whether the challenged evidence was obtained from lawful sources and by lawful means independent of the police misconduct."); *United States v. Griffin,* 48 F.3d 1147, 1150 (10th Cir.), *cert. denied,* 515 U.S. 1168, 115 S.Ct. 2630, 132 L.Ed.2d 870 (1995)(independent source doctrine applied in the context of the Fifth Amendment when, prior to defendant's arrest, a coconspirator had already told police about most of the salient facts contained in the defendant's statement, including the names of accomplices who later testified against him).

Holland's statement provided the government with information regarding his personal life, drug activity and alleged acts of violence.[20] As elucidated below, virtual-

---

**20.** Montgomery also made a statement in response to improper questioning:

"MONTGOMERY is currently residing at 1522 Upshire Road with his mother, telephone number [ ]. MONTGOMERY is not employed, but works odd jobs at the Short Stop Bar on Washington Boulevard. MONTGOMERY stated that he does not make very much money working part-time at this bar. He stated that the owner of the Short Stop Bar is BRUCE (Last Name Unknown—LNU).

"MONTGOMERY returns to Westport from 1522 Upshire Road each day because he grew up there and he knows everyone there. MONTGOMERY plays basketball at the Recreation Center and visits with friends during the day. MONTGOMERY denies that he sold drugs.

"MONTGOMERY advised that he has known DIDDLES (true name: DWAYNE HOLLAND) all his life. MONTGOMERY stated that DIDDLES used to be a big drug dealer when HOLLAND worked for TIMIR (Phonetic—PH) STANSFIELD. HOLLAND dealt heroin for STANSFIELD. MONTGOMERY does not know what HOLLAND does now. MONTGOMERY stated that he does not pay attention to what other people do, he only stays to himself. However, he

ly all of the information was known to the government before October 24, 1996, was a denial of culpability or was self-serving (and therefore disregarded by law enforcement).

The following are Holland's statements about his personal life, as documented in the FBI 302 of the October 24, 1996, interrogation, with references to government documents which reflect that the information was already known to federal authorities as of October 24, 1996:

1. "HOLLAND stated he has lived in the Westport area since he was very young." Lavar Redmond informed the government of this on August 20, 1996. The FBI 302 of his meeting with law enforcement on that date states, "Redmond stated that inasmuch as he had grown up in Westport, he was aware as a kid that 'DIDDLES' was the main drug dealer in Westport." Ex. 12, p. 3.[21]

2. "He does not have a job and he does not own or drive a car." On August 21, 1996, Steven Jones informed the government that "... 'DIDDLES' does not own an automobile ...." Ex. 13, p. 2.

3. "HOLLAND lives at 2416 Annor Court, Baltimore, Maryland, with his 'sister' PRECIOUS WHITE and his mother NANCY THOMAS." Special Agent David Hedges's November 13, 1994, affidavit in support of his search warrant for 2416 Annor Court and other properties stated, "White advised SA Dominic J. Barbara that 2416 Annor Court is Holland's mother's residence and Holland resides at that location ." Ex. 9, p. 10.

4. "HOLLAND also has a half-brother named PIRRIE COATES." Redmond informed the government of this fact on August 20, 1996. The FBI 302 of his meeting with law enforcement on that date states, " 'DIDDLES' brother, PERRY COATES, also works for 'Diddles.' " Ex. 12, p. 4.

5. "HOLLAND has girlfriends that he stays with in the Westport area. They are SHALLEN WILLIAMS, who resides at 2605 Maisbury Court; TAMMY (Last Name Unknown—LNU), who also resides in the 2600 block of Maisbury Court. HOLLAND also has a girlfriend who lives in the apartments on South Deene Street." Redmond gave the government most of this information on August 20, 1996. The FBI 302 of that meeting states " 'DIDDLES' has two main girlfriends and has children by both. One, everybody calls her RO or ROSE who lives at 2605 Maysberry Court in Westport. The other one (BLANCHE BROWN) lives at 2501 Southdene." Ex. 12, p. 5. The remainder of the information was provided by Steven Jones on August 21, 1996. The 302 of that meeting states, "JONES advised that 'Did-

---

has observed TROY WASHINGTON distribute testers to people in the past.

"MONTGOMERY advised that he likes handguns and he has learned to fix them. MONTGOMERY stated that he would search for employment as a gunsmith if he were legally allowed to. When MONTGOMERY was asked who owned the handgun seized in February of 1996 from the black Nissan Maxima he was observed driving, MONTGOMERY stated, "Next question."

For the reasons discussed in text with respect to Holland's statement, the information contained in Montgomery's statement does not require suppression of any evidence other than the statement itself."

**21.** Exhibit references are to the government's *ex parte* response to defendants' motion for a hearing on tainted evidence. Although originally filed *ex parte* for the protection of some of the witnesses referred to therein, the motion and exhibits attached thereto were served on the defendants prior to the start of trial and after my protective order had expired.

dles' has another girlfriend named TAMMY whom he stays with from time to time who lives in the third house off Nevada on Maysberry Court." Ex. 13, p. 6.

The only information provided by Holland about his personal life and not already known to law enforcement was that he did not have a job, that his mother's name was Nancy Thomas, that his sister Precious White also lived at 2416 Annor Court and that the name of one of his girlfriends was Shallen Williams. Because this information was not used by law enforcement in its continuing investigation of Holland, I denied Holland's motion to suppress evidence based on taint.

On October 24, 1996, Holland also provided the following information, which was already known to law enforcement, regarding his involvement with drug dealing:

1. "He stated that RONALD HAMMOND and TROY WASHINGTON were large drug dealers." Special Agent David Hedges's ("Hedges") November 13, 1994, affidavit in support of a search warrant for 9 Hummingbird Court and other properties indicated "Local law enforcement learned, through general intelligence sources, that Hammond is in business with his brothers Troy Terrell Washington and Antwan Ranson. Sergeant Andre Street advised your Affiant that Hammond took over the drug operation when his uncle, Timmarror Stanfield, was convicted in 1987 for drug distribution and related crimes." Ex. 9, p. 2.

2. "JAMES RENALDO, aka, Nardo, and Giggles (true name unknown) gave out testers for HAMMOND's organization." Hedges's 302 of his conversation with confidential source, Vance Williams, on August 25, 1994, stated "[s]ource noticed that young, black males associated with RONALD HAMMOND were out in the Nevada Street area. Source spoke with RIENALDO JAMES." Ex. 4, p. 1. Hedges's November 13, 1994, affidavit for a search warrant stated, "... on 10/10/94 Ronald Hammond was giving free samples, known as testers, of heroin to people in Cherry Hill section of Baltimore." Ex. 9, p. 4.

3. "DINKUS (true name unknown) sold controlled dangerous substance (CDS) for DANIEL HILL, aka Fatty." Hedges's November 13, 1994, affidavit for a search warrant stated "... Hill has been associated with Holland since 1993." Ex. 9, p. 9. Redmond's FBI 302 stated, "'Fatty' set up shop with his brother 'WHITE BOY' and a young kid named DINKUS (HARRISON CONYERS), ...." Ex. 12, p. 3.

4. "HOLLAND stated that after STANSFIELD was arrested, HOLLAND continued to sell drugs. HOLLAND stated at that time he made approximately $800.00 a day selling drugs." Hedges's November 13, 1994, FBI 302 reflects, "... Hammond took over the drug operation when his uncle, Timmarror Stanfield, was convicted in 1987 for drug distribution and related crimes." Ex. 9, p. 2.

5. "LARRY LAMBERT and MELVIN CORBIN dealt heroin for HOLLAND in the past." The FBI 302 regarding information provided by Steven Jones on October 22, 1996, stated "... advised that source had been in contact with LARRY LAMBERT. Source advised that LAMBERT previously had been employed as a drug distributor for the DWAYNE HOLLAND drug distribution organization." Ex. 16. The FBI 302 prepared in connec-

tion with Mannix White's covert recording of his conversation with Holland, Lambert and Jones on October 12, 1994, stated, "[d]uring that time someone came to purchase some crack from DWAYNE HOLLAND and HOLLAND told him to get it from either KEVIN JONES or LARRY LAMBERT." Ex. 6, p. 1. The FBI 302 of Hedges's conversation with confidential informant Vance Williams on February 22, 1995, stated, "Holland currently has MELVIN (LNU) and KEVIN working for him." Ex. 10. The government's FBI 302 of its August 20, 1996, meeting with Redmond stated, "MELVIN CORBIN, aka: 'M & M' is one of his lieutenants and MELVIN is usually the one that picks up the stash in the woods." Ex. 12, p. 4. Additionally, the FBI 302 of it August 21, 1996, conversation with Steven Jones stated, "Jones advised that 'M & M' whose real name is MELVIN CORBIN runs 'Diddles' stash house ...." Ex. 13, p. 2.

Because this information was already known to law enforcement at the time of Holland's statement, I found that the independent source doctrine applied, and I denied Holland's motion to suppress evidence based on taint.

The following information provided by Holland regarding his drug distribution activity was not known to law enforcement:

1. "HOLLAND stated that he has sold drugs in Westport since the late 1980's, but that he has recently stopped. He stated he was never a big drug dealer. HOLLAND stated that he only sold enough to get by."

2. "He stated that he could not compete with HAMMOND because HAMMOND bought larger (kilo) quantities and HAMMOND had better quality."

3. "HOLLAND stated that years ago when he worked for TIMIR (Phonetic—PH) STANSFIELD, the operation made $30,000.00 per day."

4. "HOLLAND gave CORBIN 50 pieces of heroin to sell recently."

5. "HOLLAND stated that he would make trips to New York City, New York, to purchase drugs for sale in Baltimore. HOLLAND would take the train from Baltimore to New York City. HOLLAND stated that he bought drugs at 45th and Broadway through Hispanic males. HOLLAND stated that he would give the Hispanic males money and they would return later with the drugs. HOLLAND stated that the Hispanic males spoke broken English and had never ripped him off. HOLLAND also stated that at times he would take a female with him on the trip to New York to purchase drugs."

With the exception of the information about New York, contained at ¶ 5 above and discussed more fully below, I found that the information provided by Holland regarding his drug activity which law enforcement did not already know about was either self-serving (and therefore disregarded by law enforcement), historical (and therefore not relevant to the instant investigation) or, based upon the *voir dire* of the witnesses, not used in any way to shape the testimony, refresh the recollection or otherwise affect the witnesses in this case. Accordingly, I found that Holland's motion to suppress based on tainted evidence must be denied.

Holland also provided the government with some information regarding acts of violence. Like some of the information regarding his drug activity, much of this information was known to law enforcement, self-serving (and therefore not believed or used by the government) or sim-

ply not used in any way to further the investigation of the case:

1. "HOLLAND was advised that he had been implicated in some homicides in Baltimore. HOLLAND stated that he beat those two homicides and he has never shot anyone."

2. "HOLLAND also advised that in the case of the fat boy who was killed at 2618 Maisbury Court, HOWARD HORTON, aka Binky, was responsible for that homicide. HOLLAND advised that MELVIN CORBIN and a female helped set up the victim. HOLLAND stated that they did not know that HORTON was going to kill COLEMAN. HOLLAND stated that THERESA (LNU) was HORTON's girlfriend at the time."

3. "HOLLAND also advised that he did not know MANNIX WHITE had killed HOWARD HORTON, aka Binky. HOLLAND stated that he asked WHITE if he killed HORTON and WHITE denied the murder. WHITE had in fact killed HORTON. HOLLAND stated that HORTON had been acting 'crazy' prior to being killed by MANNIX WHITE." Hedges's November 13, 1994, affidavit in support of a search warrant stated, "White advised ... that he killed Howard Horton a/k/a, 'Binky,' and that someone is trying to kill him." Ex. 9, p. 6.

4. "HOLLAND also advised that ANDRE WILLIAMSON, aka Boobie, is a distance [sic] cousin of HOLLAND's."

5. "HOLLAND also stated that HORTON shot ANTWAIN (LNU) and MELVIN RUST shot TOMMY (LNU)." Hedges's November 13, 1994, affidavit in support of a search warrant stated, "... White told a FBI agent that he had committed numerous murders, and provided the details as to one murder and two shootings." Ex. 9, p. 2.

6. "HOLLAND also denied doing stickups in Baltimore."

7. "HOLLAND also denied competing for a drug corner."

As discussed above, much of the information provided to law enforcement by Holland on October 24, 1996, was already known to law enforcement. To the extent that the information above was shown to have already been in the cognizance of law enforcement on October 24, 1996, I found that the independent source applied, and I denied Holland's motion to suppress evidence.

In an effort to determine if any improper use was made of Holland's or Montgomery's statements, I permitted the government, Holland and Montgomery to *voir dire* relevant witnesses. I permitted inquiry into whether, *inter alia*, the fact that Holland made a statement was made known to them as well as whether the substance of Holland's statement was used to garner or develop their cooperation or recollection. I found that the information not already known to law enforcement was not used to obtain further evidence in this case, and if it was, it did not result in the admission of evidence that was not derived from an independent source. Accordingly, I denied Holland's motion to suppress based on tainted evidence.[22]

---

**22.** The government initially conceded that it learned about Holland's trips to New York to get drugs from Holland's October 24, 1996, statement. Accordingly, at trial I instructed the jury that it was to disregard the testimony of Colethar Gilliam (who testified that she accompanied Holland on one such trip for a drug purchase) in its consideration of the guilt or innocence of Holland. However, I found that her testimony regarding trips to New York with Holland was admissible against the other defendants. This was, concededly, a less than ideal resolution of the emergent conflict between the evidence ad-

### B. COATES'S MOTION FOR SEVERANCE

 Prior to trial, Coates moved to dismiss the indictment on the grounds that the prosecution was barred by the Double Jeopardy Clause of the Fifth Amendment. *Holland,* 985 F.Supp. at 593. I denied the motion but found that it was not frivolous and, as a result, I declined to retain jurisdiction over Coates's charge.[23] Coates filed an interlocutory appeal. The Fourth Circuit dismissed the appeal in an order filed January 6, 1998. On January 12, 1998, the trial of the seven defendants, including Coates, began. Because the Fourth Circuit had not issued a mandate by the start of the trial of this case, on January 21, 1998, Coates moved to sever the trial of his charge based upon lack of jurisdiction. I denied the motion, construing the Fourth Circuit's January 6, 1998, order dismissing the appeal as the Court's mandate. Contrary to my ruling, on January 28, 1998, the Fourth Circuit issued its mandate which stated, "[t]he order of this Court dated 1/6/98 takes effect today."

I am aware that the Fourth Circuit has stated, "[o]ur control over a judgment of our court continues until our mandate has issued, . . . unless, of course, our control has been ousted by proceedings in the Supreme Court." *Alphin v. Henson,* 552 F.2d 1033 (4th Cir.), *cert. denied,* 434 U.S. 823, 98 S.Ct. 67, 54 L.Ed.2d 80 (1977). I am also aware that a conviction may be reversed because the trial after an interlocutory appeal began prior to the issuance of a mandate by an appellate court. *See e.g., United State v. DeFries,* 129 F.3d 1293 (D.C.Cir.1997)(reversing conviction where the appellate court was considering motion for rehearing at the time the district court began the trial of the charges).

Nevertheless, the principle of allowing finality of the appellate court's review of an issue was served in this case, and I am persuaded that I properly exercised jurisdiction over the charges against Coates. Although I proceeded under the erroneous view that the January 6, 1998, order constituted a mandate, I conclude that the decisive action by the Fourth Circuit and the lack of action by Coates after the Fourth Circuit rendered its order permitted me to exercise jurisdiction over the trial of Coates's charges. The Fourth Circuit issued a speedy and definitive response to Coates's appeal of my denial of his double jeopardy motion. The Court clearly found the claims frivolous and *sua sponte* dismissed the appeals, even though the government had merely sought a stay of the appeal pending completion of the trial. The court made no effort to amend its ruling. After the issuance of the January 6, 1998, order dismissing Coates's appeal, Coates took no other action at the circuit level. He did not request a stay of the mandate under the Fed.R.App.P. 41(a), nor did he file a petition for rehearing under Fed.R.App.P. 40(a) or a petition for *certiorari* with the Supreme Court. Where neither the appellate court nor Coates took any further action with respect to the appeal, the interest of requiring a mandate prior to the commencement of a district court trial after an interlocutory appeal was fully served.

missible against the several defendants. I remain persuaded, nevertheless, that Holland's renewed motion for severance properly was denied.

Despite its initial concession, the government later demonstrated that it knew about the trips to New York prior to October 24, 1996, from the October 12, 1994, audiotaped conversation of Holland and Jones. Accordingly, I am now persuaded that my limiting instruction to the jury regarding Gilliam's testimony was unwarranted, as that testimony was not impermissibly derived from the un-

constitutional interrogation of Holland, but was derived from independent sources.

**23.** Carroll and Hill also filed pre-trial motions to dismiss based upon the Double Jeopardy Clause of the Fifth Amendment. Although I denied their motions, unlike Coates's motion, I found Carroll and Hill's to be frivolous and retained jurisdiction over the trial of their charges. *United States v. Holland,* Crim. No. AMD 96–0399, paper no. 197 (November 25, 1997).

## III. MOTIONS FOR JUDGMENT OF ACQUITTAL [24]

### A. LOST PHOTOGRAPHS (COUNTS 5, 7 AND 8)

Holland argues that the convictions on counts 7 and 8 must be vacated because the government acted in bad faith in losing the photographs of the interior of 2628 Maisbury Court taken on February 8, 1996. Holland and Montgomery were convicted of count 7, PWID 83 bags of crack, and count 8, PWID within proximity of a playground.[25]

Holland argues that the photos were critical because: (1) trial testimony showed that Barksdale was the only witness who testified that he saw a package in Holland's hand which Holland passed to Montgomery; (2) no fingerprints were taken; (3) Detective Bristol testified that the interior of 2628 Maisbury Court was small, with only 8 feet separating the threshold of the house from the stairs, while other testimony established that a couch was wedged against the side of the stairs, further limiting access to them; (4) there was contradictory testimony regarding where the door fell: Detective Moore testified that the door fell all the way to the stairs, while Barksdale testified that the door fell well short of the stairs, leaving room for Montgomery to pass; and (5) the photographs were the "only evidence the defense could have used to effectively cross-examine Detective Barksdale as to his ability to see what he claims to have seen."

Holland further argues that the court should infer bad faith because: (1) Barksdale's testimony at the taint hearing and at the trial "reeked of deceit;" (2) the fact that the entire file, instead of just the photographs, was lost should not weigh against a bad faith finding because Barksdale was able to reconstitute every other

portion of the file; (3) "there can be little question that Barksdale knew and appreciated the importance of the photographs;" (4) the September 29, 1997, pre-trial hearing testimony established inconsistencies between Special Agent Michael Harrigan's (the case agent) and Barksdale's stories regarding when the photos were lost; and, (5) the photos were sufficiently valuable that proof of bad faith was not required under *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

■ As indicated in my earlier opinion in this case, *Holland,* 985 F.Supp. at 594–95, the Due Process Clause is violated and an indictment must be dismissed or evidence suppressed if the exculpatory value of the evidence is apparent before the evidence is destroyed and the evidence is of such a nature that defendant is unable to obtain comparable evidence by other reasonably available means. *Trombetta,* 467 U.S. at 489, 104 S.Ct. 2528. However, if the exculpatory value is indeterminate and the court can only conclude that the evidence was "potentially useful" to the defense, the defendant must demonstrate police acted in bad faith in failing to preserve evidence. *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333.

For the reasons stated in my earlier opinion denying Holland's motion to dismiss on the same grounds, the motion for judgment of acquittal on these counts shall be denied. Nothing that occurred in the course of the trial has changed my conclusion that the defendant has not established that the government or the police acted in bad faith with respect to the photographs.

### B. ALLEGED INDICTMENT DEFECTS (COUNTS 5 AND 8)

■ Holland argues that the convictions for counts 4 and 8 must be vacated

---

**24.** Motions of each defendant are deemed adopted by the other defendants to the extent applicable.

**25.** Holland asks that I reconsider my ruling that the photographs' usefulness "would extend only to the credibility of Officer Barks-

dale's testimony and the weight of the evidence," *Holland,* 985 F.Supp. at 596, because trial testimony showed that counts 7 and 8 were based *entirely* on Barksdale's testimony. I decline to do so.

because Holland's Fifth Amendment right to have the grand jury consider the charge against him was violated. He argues that the indictment required that the government prove that the PWID occurred within 1000 feet of *a single piece* of "real property comprising a playground *and* the Westport Elementary School." Counts 5, 8 (emphasis added). Holland notes that the government's requested jury instruction changed the conjunctive form "and," as found in the indictment, to the disjunctive form "or." Holland further notes that he had reason to believe, based upon the indictment, that the government had to prove acts done within property with a playground *and* Westport Elementary. Holland's reliance is further justified, he argues, because discovery relating to Melvin Corbin showed that while Corbin was distributing drugs at a playground the distribution ˮ was within 1,000 feet of a school.[26]

The Fifth Amendment to the Constitution· states "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury ..." U.S. CONST., Amend. V. However, I am not persuaded that instructing the jury that distribution or PWID within 1,000 feet of Westport Elementary *or* a playground is a "constructive amendment" of the indictment warranting reversal.[27] *Cf. United States v. Floresca*, 38 F.3d 706 (4th Cir.1994)(en banc)(holding the Grand Jury Clause is violated where the district court instructed jury that it could convict defendant of witness tampering under different section of Code than the section charged in the indictment; reviewing under plain error standard); *United States v. Downer*, 143

F.3d 819 (4th Cir.1998)(holding that Grand Jury Clause violated where the district court vacated conviction for crime which did not exist statutorily at the time of defendants actions and substituted conviction for lesser included offense which did exist).

█ Holland further argues that the convictions under counts 4 and 8 should be vacated because the government likewise failed to prove that the school was an "operating" school. He argues that "operating" is an element of the offense which, he contends, was impermissibly withheld from consideration by the grand jury or the petit jury.

In *United States v. Hawkins*, 104 F.3d 437, 440–41 (D.C.Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 126, 139 L.Ed.2d 76 (1997), the court was asked to decide whether sufficient evidence was presented at trial to sustain the defendant's conviction for distribution of heroin within 1,000 feet of a school. The court reasoned as follows:

> Hawkins contends that in order to prove a violation of the schoolyard statute the Government must show that he possessed or distributed heroin within 1,000 feet of an actual school, not just a school building that is no longer (or not yet) in use as a school. We agree.

*Id.* The court went on to state "we conclude that the Congress intended to subject drug dealers to enhanced punishment only for conduct occurring within 1,000 feet of an operating school (or other listed facility)." *Id.* at 440–41. However, the court held that where an officer testified that the drug offense alleged occurred

---

26. Corbin was a member of the Holland organization who, along with the above defendants, was charged in the first superseding indictment with conspiracy to distribute and to possess with the intent to distribute heroin and crack. Prior to trial, however, Corbin agreed to cooperate with the government, pleaded guilty to the conspiracy charge and testified at the trial.

27. Section 860 of Title 21 applies to:
 [a]ny person who violates section 841(a)(1) or section 856 of this title by distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of, the real property comprising a public or private elementary ... school, ... or a playground ...

within 1,000 feet of a named school, there was sufficient evidence from which a reasonable juror could conclude that the word "school" referred to an "operating school." *Id.* at 441.[28]

Although *Hawkins* addressed sufficiency of the evidence and did not address the failure of the grand jury expressly to pass on the issue of whether the school was operating, I find it instructive. The court focused on the fact that a specific name was used by the witness when referring to the school. Likewise, the indictment in this case alleged that the drug distribution activity occurred within 1,000 feet of a named school, i.e., Westport Elementary School. Just as the evidence in *Hawkins,* viewed in the light most favorable to the government, resulted in the conclusion that the jury had a reasonable basis to conclude that the named school was an operating one, the inclusion of the specific name of the school (i.e., "Westport Elementary School") by the grand jury in the indictment indicates that the grand jury did pass on whether the school was an operating facility. Accordingly, I shall deny Holland's motion for judgment of acquittal on counts 4 and 8.

## IV. MOTIONS FOR NEW TRIALS ON ALL COUNTS [29]

### A. PREJUDICE FROM DEFENDANT KEVIN JONES'S TESTIMONY

■ After the jury had been sworn, counsel had given opening statements and the government had begun to present testimony, the government moved for production of voice exemplars from Holland, Jones and Hill. The government sought to submit the exemplars to the jury for comparison with the voices on the audiotapes which it planned to introduce into evidence in its case-in-chief. The defendants opposed the motion. I ruled that in the exercise of my discretion, largely because of the inexcusable belatedness of the motion, I believed that granting the request would prejudice the defendants. Accordingly, I denied the request. Nevertheless, in the defense case, against the advice of counsel as explicated in detail on the record outside the presence of the jury, Jones elected to testify.

■ Holland bases his request for a new trial on the argument that Jones's testimony prevented Holland from exercising a key "trial right." *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Holland argues that he had the right to rely on my ruling denying the government's request for voice exemplars, Jones's testimony effectively nullified the beneficial impact of my ruling for Holland and, as a result, I should grant a new trial. Holland further argues that Jones's testimony presented antagonistic defenses.

Holland argues that Jones's testimony caused enormous and unfair prejudice to Holland's defense and severance was required. Jones testified, *inter alia,* that: (1) he purchased and sold drugs in the past; (2) he was speaking with Holland on the October 12, 1994, audiotape presented to the jury during the government's case; (3) his October 12, 1994, discussion with Holland was about drug distribution strategies; and (4) he was charged with first degree murder (among other offenses) in the past. Apparently, Jones's theory was that although he sold drugs and spoke with

---

**28.** The officer testified that the offense occurred "within 1,000 feet of the 'Garnett–Patterson Junior High School.' He clarified his statement by adding 'a middle school.'" *Id.* at 441.

**29.** Holland also argues that the government illegally taped him in October 1994 after his right to counsel had attached under *Massiah*

and these tapes contributed to the jury's verdict, and the verdict was based on witness testimony derived from the government's 1996 illegal post-arrest interrogation of Holland. For the reasons discussed at II *supra,* the motion for a new trial on these bases is denied.

Holland regarding drug distribution strategies, he did not sell drugs for Holland.

 Fed.R.Crim.P. 14 governs severance. The court has a "continuing duty at all stages of the trial to grant a severance if prejudice does appear." *Schaffer v. United States*, 362 U.S. 511, 516, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960). Prejudice determinations require a fact-specific, case-by-case analysis. *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933. Severance is required if there is "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* However, "the mere presence of hostility among defendants, ... or the desire of one to exculpate himself by inculpating another [are] insufficient grounds to require separate trials, ... and thus, [a]ntagonistic defenses do not per se require severance even if the defendants ... attempt to cast the blame on each other." *United States v. Spitler*, 800 F.2d 1267 (4th Cir.1986)(internal citations and quotations omitted). *Cf. U.S. v. Johnson*, 478 F.2d 1129, 1133 (5th Cir. 1973)(co-defendant "Smith was the government's best witness against Johnson" and severance required); *United States v. Peveto*, 881 F.2d 844, 858 (10th Cir.), *cert. denied*, 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989)(noting that danger of unfair prejudice "is exacerbated when one defendant admits some or all of the elements of the charge"); *U.S. v. Romanello*, 726 F.2d 173, 177 (5th Cir.1984)(severance warranted where "one defendant accuse[d] the other, and the other denie[d] any involvement").

In the determination of this issue, the case of *United States v. Angiulo*, 897 F.2d 1169 (1st Cir.), *cert. denied*, 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990), is instructive. In that case, the government's evidence against two defendants charged with conspiracy to murder and owning and operating an illegal gambling business consisted of recorded conversations in which defendant Granito discussed with defendant Gennaro prior unsuccessful attempts to kill the victim and the division of profits in the gambling business. Granito argued in his defense that he had withdrawn from the conspiracy to murder and was simply inquiring about the gambling proceeds as a favor to another individual. Gennaro claimed that the tapes were unintelligible and there was insufficient evidence to prove his guilt beyond a reasonable doubt. The First Circuit found the arguments not to be mutually antagonistic:

> Granito's theory of defense was simply that he had withdrawn or was not involved in the crimes charged. We recognize that this theory did not always mesh perfectly with Gennaro's defense. Thus, while Gennaro argued that conversations on certain crucial tapes were unintelligible, Granito chose not to challenge the tapes but rather focused on furnishing innocent explanations for the conversations attributed to him by the government. Furthermore, some of Granito's explanations could have been accepted by the jury as compatible with a determination that Gennaro was guilty on the offenses charged. For example, Granito's explanation that he inquired about the poker game proceeds only as a favor [for another] could have been accepted by the jury as compatible with a determination that Gennaro was in charge of the poker games. But this does not make the defenses antagonistic. To conclude that defenses are antagonistic, we must find the jury's belief of one defendant's theory necessarily compels a finding that the other defendant is guilty. This is not the situation here. The jury could have believed that Granito withdrew from the murder conspiracy and never participated in the gambling enterprise without being compelled to find Gennaro guilty of these offenses. Phrased another way, the jury could have believed Granito's withdrawal/non-involvement defense while also accepting Gennaro's contention that there was insufficient evidence to convict him.

Thus, no antagonistic defenses existed sufficient to require severance. *Id.* at 1195.

Like the defendants in *Angiulo*, Jones and Holland presented divergent but not mutually antagonistic defenses. Jones sought to extricate himself from the conspiracy, while Holland sought to cast doubt on the government's evidence. Although Jones admitted to having a recorded conversation with Holland about drugs, his testimony did not establish that Holland was, in fact, the drug dealer that the government alleged. The jury could have believed that Jones was involved with drugs without also necessarily believing that Holland was the leader of the drug distribution organization in Westport as alleged in the indictment. Accordingly, I find that the defenses of Jones and Holland were not mutually antagonistic and that even if Holland's "trial rights" were adversely affected by Jones's testimony, the harm to Holland did not rise to the level of a constitutional infringement.

## B. ALLEGED *BRADY, GIGLIO* AND *GILES* VIOLATIONS

■ Holland argues that a new trial should be granted pursuant to Fed. R.Crim.P. 33 based upon newly discovered evidence. He argues that the government violated its duty to provide the defense with exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giles v. Maryland*, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967); and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), by withholding information related to co-defendant Melvin Corbin's plea agreement and sentencing.

Specifically, Holland argues that the government withheld from defense counsel and the jury information: (1) that Corbin was liable for the death penalty under Application Note 2 of U.S.S.G. § 2A1.1; and (2) that Corbin was to have been sentenced at offense level 43, life in prison, under U.S.S.G. § 2A1.1 and Application Note 2. Further, Holland argues that the government mislead: (1) the court by falsely advising that Corbin was entitled to a downward departure to second degree murder because "... the defendant did not intentionally kill [Woodson]," knowing that the downward departure to second degree murder does not turn on the *mens rea* of those with derivative liability but turns solely on the *mens rea* of the killer; and (2) defense counsel and the jury via Corbin's plea agreement, in reciting therein that Corbin's base offense level was 34, when the government knew, as it now contends, that Corbin's base offense level (as calculated from the amount of drugs involved in the conspiracy) was a level 38.

■ The facts surrounding these contentions arose in connection with the sentencing of Corbin, as described here. On July 13, 1998, approximately three days before the consolidated hearing regarding sentencing issues among others, the government filed and served on defense counsel the "Government's Supplemental Sentencing Memorandum." That document reflected the fact that the government had previously supplied the court with information (not contained in Corbin's plea agreement) that Sentencing Guidelines §§ 2D1.1(d) and 2A1.1 applied to Corbin, and he was therefore potentially liable for a life sentence at offense level 43. At the hearing held in this case on July 17, 1998, the government provided the defense with several additional documents which had been provided to the court in connection with Corbin's sentencing hearing held on April 24, 1998. One of the documents referring to Corbin's impending sentencing indicated that the government believed proper application of the guidelines to Corbin:

> ... requires a base offense level of 43 pursuant to U.S.S.G. § 2A1.1 (first degree murder). As a participant in the jointly undertaken criminal activity of the drug organization, he is responsible under U.S.S.G. § 1B1.3 for the reasonably foreseeable acts of others commit-

ted in furtherance of the criminal activity. The killing of Antonio Woodson was just such an act.

Although the cross reference at § 2D1.1(d) requires that the offense level under 2A1.1 be applied, Application Note 1 of § 2A1.1, contemplates a downward departure where, as here, the defendant did not intentionally kill the victim. Under such circumstances, the Commission countenances a downward departure to the base offense level for second degree murder (33) or the base offense level for the underlying offense, which in Mr. Corbin's case is the drug quantity offense level of 34.

Def's Supp. Mem. in Supp. New Trial and Sent., Ex. E.[30] This cross-reference to first degree murder was not contained in Corbin's plea agreement, which was supplied to defense counsel and admitted as evidence at trial. Holland alleges that the government misled the jury on this issue by submitting Corbin's plea agreement as the "complete" plea bargain with Corbin. Holland argues that the government left defense counsel and the jury with the misleading impression that Corbin was to be sentenced solely on the basis of drug quantities, without regard to § 2A1.1, and that his base offense level, based upon drug quantities, was a level 34.

The decision of the Fourth Circuit in *United States v. Griley*, 814 F.2d 967 (1987), illuminates the correct resolution of this issue. In that case, the government entered into a plea agreement with Moran, a cooperating witness, in exchange for his testimony in Griley's trial on charges of firearms violations. Moran pleaded guilty to making a false statement on a firearms transaction record. *Id.* at 970. As part of his plea agreement, Moran agreed to testify "fully and truthfully" at any trial where his testimony might be relevant. *Id.* The prosecutor's initial plea letter stated that "[a]t his sentencing, the United States Attorney's office will make no recommendation as to the sentence Mr. Moran should receive." *Id.* at 971. At the sentencing hearing, however, the government recommended probation. *Id.*

Griley argued that the government's unilateral change in Moran's sentencing recommendation implied "prosecutorial misconduct" and that "the government . . . misled the jury and the district judge as to Moran's motives to testify truthfully." *Id.* The court noted that *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and *Campbell v. Reed*, 594 F.2d 4 (4th Cir.1979), "indicate that when a witness's description of his plea bargain does not comport with the actual terms of the bargain, the jury may not be able to assess

---

**30.** Holland argues that the government incorrectly advised the court that since Corbin did not "intentionally" kill the victim, he was entitled to a downward departure. Holland states, "[t]his representation was inaccurate because U.S.S.G. § 1B1.3 makes it clear that Corbin was responsible for the reasonably foreseeable acts of others committed in furtherance of the criminal activity and, according to the government, 'the killing of Antonio Woodson was just such an act.'" Def's Supp. Mem. in Supp. New Trial and Sent., Ex. E. Holland goes on to point out that Application Note 2 to U.S.S.G. § 1B1.3 makes it clear that:

The requirement of reasonable foreseeability applies only in respect to the conduct (i.e., acts and omissions) of others under subsection (a)(1)(B). It does not apply to conduct that the defendant personally undertakes, aids, abets, counsels, commands, induces, procures or willfully causes; such

conduct is addressed under subsection (a)(1)(A).

Holland asserts that Corbin was *not* entitled to a downward departure because he ". . . did not intentionally kill the victim." The relevant *mens rea*, he argues, is that of the principal actor (allegedly Holland) and not the other members of the conspiracy. Corbin's intent is not relevant for purposes of a downward departure; only the shooter's intent is relevant. Def's Mot. New Trial Based upon Newly Discovered Evid. at 3.

I believe that Holland is correct. However, the fact that I granted a downward departure for Corbin does not automatically entitle any other defendant to the benefit of my error, which was of no moment in Corbin's case, in any event. *See also infra* Pts. V(A)(4), (C). Nor does it establish that the government did anything improper in urging that I depart downward.

the witness's credibility accurately and a due process problem may exist." *Id.* at 972. The Court went on to state:

> The government has an obligation to prevent his problem by ensuring that a witness correctly describes his plea arrangement to the jury. In this case, Moran's testimony did not match the exact terms of his ultimate plea bargain. The prosecutor created this mismatch by suddenly and unilaterally changing her sentencing recommendation for strategic reasons. We do not favor such an abrupt change which may, in some circumstances, suggest that a witness will receive favorable treatment from the government of which the jury was unaware.

*Id.* Nevertheless, the Court held that where the changed recommendation "came as a complete surprise to Moran," it would not reverse Griley's conviction. The Court noted that the important distinction between *Griley* and the holdings in *Napue* and *Reed* was that:

> [t]he actual plea bargain arrangements in effect at the time of trial differed from the arrangements which the witnesses described in their testimony. By contrast, in this case, Moran knew the precise terms of the agreement that was initially made, and accurately described them to the jury. The fact that this

agreement was later changed, without Moran's knowledge or participation, has no bearing on his incentive to testify for the government. By inference, the change in the agreement also did not influence the jury's assessment of Moran's credibility, or the jury's ultimate decision. The allowance of the prosecutor's changed recommendation, then, constitutes harmless error.

The situation presented in this case is much like that presented in *Griley*. At the time of his testimony, Corbin testified accurately about the plea agreement in effect in his case and the government moved the actual agreement into evidence. Only after Corbin testified and the trial of the other defendants had ended did the government introduce into Corbin's sentencing proceeding its view that a § 2A1.1 cross reference should apply. There is absolutely no evidence that the government and Corbin entered into a side-agreement which was withheld from the jury's consideration or that the true nature of the agreement contemplated the § 2A1.1 cross reference and a downward departure.[31] Accordingly, I find that there was no prosecutorial misconduct and no due process violation occurred. Accordingly, I deny Holland's motion for a new trial on this basis.[32]

---

**31.** Holland submitted with his motion for a new trial on this issue an affidavit of his lawyer, Charles Bernstein, Esq., indicating that Bernstein had spoken with Corbin's lawyer, Gerald Ruter, Esq., who indicated that he and Corbin had discussed, prior to Corbin's testifying in the trial of this case, "concerns about Mr. Corbin's potentially receiving a life imprisonment sentence because of the murder." Bernstein further affirms that Ruter indicated that "Mr. Ruter had some reason to believe that Mr. Corbin would not receive a life sentence because of the plea agreement he negotiated and he conveyed this belief to Mr. Corbin prior to Mr. Corbin's testifying." Bernstein further swears that Mr. Ruter advised him that he "remembers discussing the applicability *vel non* of S.G. § 2A1.1 with Martin Clarke, AUSA, but he cannot now remember when they discussed it, *i.e.*, he cannot remember whether it was before Corbin's testimony in this case or after."

> This showing does not change my analysis. Although Corbin may have known, through the thoroughness of his counsel, of the existence in the law of the possibility of the application of the § 2A1.1 cross reference to him, there is no evidence from which I can conclude that it was an unspoken part of the plea agreement between Corbin and the government. Nothing has been presented which persuades me that this issue warrants a full-blown evidentiary hearing.

**32.** The plea agreement informed that although Corbin was hoping to receive the lower offense levels listed in the stipulation, he still faced the possibility that the court could impose the maximum sentence of life imprisonment. Plea Agmt. at ¶¶ 2, 8. The defense could have relied on these provisions of the plea agreement to argue that Corbin's testimony was motivated by his desire to avoid a sentence of life imprisonment.

## V. SENTENCING ISSUES

### A. DRUG QUANTITY

#### 1. *Foreseeability*

 For sentencing purposes, I must determine the amount of drugs involved in a conspiracy and attributable to each defendant within the conspiracy by a preponderance of evidence. *United States v. Uwaeme*, 975 F.2d 1016, 1018 (4th Cir. 1992). The quantity of drugs attributable to a defendant must be derived from that defendant's "relevant conduct." "Relevant conduct" includes acts committed by the defendant and "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). A "jointly undertaken criminal activity" is defined as "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." U.S.S.G. § 1B1.3(a)(1)(B). Thus, a defendant's base offense level in drug conspiracy cases is determined by the quantity of drugs "reasonably foreseeable to him within the scope of his unlawful agreement." *Sampson*, 140 F.3d at 591 (quoting *United States v. Lamarr*, 75 F.3d 964, 972 (4th Cir.1996)). "In order to attribute to a defendant for sentencing purposes the acts of others in jointly-undertaken criminal activity, those acts must have been within the scope of the defendant's agreement and must have been reasonably foreseeable to the defendant." *United States v. Gilliam*, 987 F.2d 1009, 1012–13 (4th Cir. 1993).

" 'Neither the Guidelines nor the courts have required precise calculations of drug quantity.' " *United States v. Sampson*, 140 F.3d 585, 592 (4th Cir.1998)(*quoting Uwaeme*, 975 F.2d at 1019). "Rather, '[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the district court shall approximate the quantity to be used for sentencing.' " *Id.* (quoting U.S.S.G. § 2D1.1, comment. (n. 12)). "Direct or hearsay testimony of lay witnesses as to the amounts attributable to the defendant can prove sufficiently reliable evidence of quantity." *Id.* "Where witnesses' estimates of drug amounts are uncertain, however, a district court is well advised to sentence at the low end of the range to which the witness testified." *Id.*

 The court can estimate the quantity using averages supported by evidence in the record. *See United States v. McMillen*, 8 F.3d 1246, 1250–51 (7th Cir. 1993), *cert. denied*, 511 U.S. 1071, 114 S.Ct. 1649, 128 L.Ed.2d 368 (1994)(upholding district court's quantity determination where the court determined the average number of transactions per week, knew the amount of drugs in 11 of 34 known transactions, determined the average amount of drugs in each of the 11 transactions and multiplied the average number of transactions per week by the average drug quantity per transaction and by the number of weeks the defendant was a member of the conspiracy). However, relevant conduct is to be determined after a searching and individualized inquiry into each defendant's role in the alleged conspiracy. *United States v. Collado*, 975 F.2d 985, 998 (3d Cir.1992).

##### a. *Government's Computations of Drug Quantity*

The government argues that Holland, Hill, Jones, Coates and Deberry should receive a base offense level score of 38. The government bases this score on its assertion that each of these defendants is responsible for the total amount of controlled substances involved in the conspiracy because all maintained membership in the drug trafficking organization throughout the period of the conspiracy, despite the fact that each served periods of incarceration. The government further contends that no evidence of withdrawal from the conspiracy was presented at trial, and each defendant was directly involved in daily activities of the conspiracy, which

encompassed heroin, crack and cocaine distribution.

The government argues that the total amount of crack distribution attributable to the Holland organization from May 1992 until September 1995 was 53 kilograms: 38 kilograms between May 1992 and October 19, 1994,[33] and 15 kilograms between October 19, 1994, and September 1995.[34] The government arrives at this figure by extrapolation. The government's position is that the organization sold 49 grams of crack per day for the 28 months during which Hill supervised the crack sales (May 1992 to October 19, 1994) for a total of 38 kilograms of crack during that period.[35] The government then adds 15 kilograms based on sales during the eleven months leading up to September 1995.[36]

The government argues that because Montgomery and Carroll did not participate in the conspiracy until 1996, only 22.38 grams of crack should be attributed to them. The government uses this amount because it was the amount seized during execution of the search warrant at 2628 Maisbury Court on February 8, 1996.[37]

The government argues that 47 kilograms of heroin should be attributed to Holland, Hill, Jones, Coates and Deberry from Fall 1992 to Fall 1995. The government suggests two computation methods: (1) based upon the wholesale purchase of uncut heroin; [38] and (2) based upon the

---

**33.** Hill was arrested on October 19, 1994.

**34.** Lambert was arrested in September 1995.

**35.** Specifically, the government relies on the trial testimony of Lambert and Corbin and the evidence of controlled purchases of crack by Williams. Corbin and Lambert testified that Hill managed the crack portion of the joint venture between Hill and Holland from approximately May 1992 until October 19, 1994. Lambert testified that during that time, dealers sold an average of 300–400 bags of crack per day. Williams made controlled purchases of crack as follows: (1) on September 14, 1994, he purchased 16 bags of crack totaling 2.28 grams (each bag averaged .142 grams); (2) on October 6, 1994, he purchased 23 bags of crack totaling 4.31 grams (each bag averaged .187 grams). The government computes that the average bag purchased by Williams weighed .165 grams.

The government next multiplies .165 grams (average bag purchased by Williams) by 300 bags (low end of Lambert's estimate of the number of bags sold from 1992 to 1995) to arrive at 49 grams of crack sold per day from May 1992 until October 19, 1994. The government then multiplies 49 grams (average amount of crack sold per day from May 1992 until October 19, 1994) by 7 days by 112 weeks (May 1992 to October 19, 1994) to arrive at a total 38 kilograms from May 1992 until October 19, 1994.

The government notes that the evidence at trial established that on October 17, 1994, a search of Hill's storage locker found 78 grams crack, $5915 and drug paraphernalia. Additionally, at the time of Hill's arrest on October 19, 1994, Hill had $2624 on his person. This information was not used by the government to calculate the crack quantity.

**36.** Lambert testified that Holland bought 4.5 ounces (127 grams) of crack from "Carl" (Holland's crack supplier after Hill's arrest) every 2½ days. Lambert testified that he, Holland and others put that amount of crack into 630 ziplock bags and that amount would last for 2½ days. On August 3, 1995, 25 bags of crack from the Holland organization were seized from Lambert and had a total weight of 4.88 grams (the average weight per bag was .195 grams).

The government divided 630 bags by 2½ days to arrive at 252 bags of crack sold per day. The government then multiplied .195 (average grams per bag of crack seized from Lambert on August 3, 1995) by 252 bags (the number of bags sold per day) and 7 days and 44 weeks to arrive at the total of 15 kilograms of crack attributable to the Holland organization during the eleven months leading up to September 1995.

**37.** The government notes that additional trial evidence of the organization's crack distribution takes the form of Corbin's testimony that he saw Deberry selling crack in front of 2628 Maisbury Court on February 8, 1996.

**38.** Lambert testified that Hill introduced Holland to Cooney, a Nigerian supplier of heroin. Lambert testified that Cooney delivered 100 grams of heroin to Holland every 7 to 10 days from Fall 1992 to Fall 1995. Lambert further testified that the ratio of cutting agent to raw heroin was 4:1 or 5:1. At 4:1, 60 grams of cutting agent would be added to 15 grams of

average daily amount of heroin sold.[39] However, the government's position is that only 51 grams of heroin are attributable to Montgomery and Carroll. The government bases this calculation on testimony regarding the amount of heroin "consigned" by Montgomery to Holland in the summer of 1996.[40]

■ I find the government's methods of calculating the respective crack and heroin quantities to be conservative, reasonable and appropriate under the facts of this case. In the absence of large seizures of heroin or crack, ledgers reflecting large transactions or substantial quantities of money from which drug quantities can be

established, I find that the use of the average quantities of individual transactions multiplied by known numbers of transactions over known periods of time is appropriate.

■ Because the government's calculations of heroin for Fall 1992 to Fall 1995 based on the average daily amount of heroin sold results in a lower quantity than its calculations based on the wholesale purchase of uncut heroin, I will apply the former method. However, I find that it is not appropriate to include the 1996 seizures to arrive at the average of .17 grams per bag of heroin distributed from the fall

raw heroin. Assuming a 4:1 ratio of cutting agent to raw heroin, 100 grams (the amount of raw heroin delivered to Holland every 10 days) divided by 15 grams (raw heroin per batch) equals 6.6 batches of cut heroin. 6.6 batches of heroin multiplied by 75 grams (total mixture weight at 4:1 ratio) equals 495 grams of cut heroin every 10 days. 495 grams of cut heroin every 10 days, divided by 10 days, equals 49.5 grams of heroin sold per day from Fall 1992 to Fall 1995.

The government notes that trial testimony showed others had knowledge of the heroin trade: (1) Gilliam testified that she went with Holland to New York to buy raw heroin; (2) the October 12, 1994, audiotape excerpt captured Jones, Lambert and Holland discussing trips to New York to buy drugs; and (3) other witnesses testified that either Coates, Holland, Deberry or Jones would cut and package raw heroin.

39. Lambert testified that from 1992 to 1995, the organization sold 250 packages of heroin per day at a cost of $10 each. The government argues that seven drug seizures from 1993 to 1996 corroborate Lambert's testimony: (1) on February 7, 1993, 10 bags with a total weight of 1.33 grams (average weight per bag of .133 grams) were found near Woodson's body; (2) on May 23, 1995, 6 bags with a total weight of .8 grams (average weight per bag of .133 grams) were seized from Corbin; (3) on September 15, 1995, 50 bags with a total weight of 7.64 grams (average weight per bag of .153 grams) were seized from Lambert; (4) on March 5, 1996, 39 bags with a total weight of 9.2 grams (average weight per bag of .236 grams) were seized from Johnathan Harris; (5) on May 13, 1996, 10 bags with a total weight of 4.3 grams (average weight per bag of .215 grams) were seized from Robert Colclough; (6) on July 17,

1996, 24 gelcaps with a total weight of 3.57 grams (average weight per gelcap of .149 grams) were seized from David Dixon; (7) on August 20, 1996, 10 gelcaps with a total weight of 3.617 grams (average weight per gelcap of .181 grams) were seized from the recorded sale to Vance Williams by Carroll and Coates.

Testimony indicated that Harris, Colclough and Dixon were participating members of the organization at the times of the seizures listed above. Lambert testified (based on jailhouse hearsay and hearsay from Tammy Baker) that Johnathan Harris, Robert Colclough and David Dixon were selling drugs for the organization in 1996. Corbin confirmed that Harris, Colclough and Dixon participated in the Holland organization in 1996.

The government computed that the average weight per bag or gelcap seized from 1993 to 1996 was .17 grams. .17 grams multiplied by 250 bags sold per day (Lambert's testimony) equals 42.5 grams sold per day (or 425 grams every 10 days). 42.5 grams per day multiplied by 7 days and 160 weeks (May 1992 to September 1995) equals 47 kilograms of heroin attributable to the Holland organization from May 1992 until September 1995.

40. Although Corbin and Lambert testified that heroin sales in 1996 were "considerably less than the years before," Corbin further testified regarding what the government referred to as a "consignment" of $3,000 worth of heroin in the summer of 1996 by Montgomery to Holland. The government divides $3000 by $10 bags to arrive at a total number of bags of 300. The government then multiplies 300 bags by .17 (average 1993 to 1996 weight per bag) to arrive at 51 grams which it attributes to Montgomery and Carroll.

of 1992 until the fall of *1995*. *See* note 39, *supra*. The government should only have considered seizures from 1992 to 1995 in determining the amount of heroin sold during that time. The government seized heroin in connection with three transactions during that time. The average of these transactions is .148 grams per bag.[41] Additionally, I find that it is not appropriate to multiply the average weight per bag by 160 weeks (May 1992 to September 1995) because Lambert testified that 250 bags per day were from *Fall* 1992 to Fall 1995. Even with these corrections, the quantity of heroin attributable to the conspiracy is still approximately 38 kilograms, placing the heroin quantity well above the 30 kilogram floor for application of a base offense level of 38.[42] Because the amount of heroin attributable to the conspiracy during this time is based upon multiplication of only three transactions, I find that it is appropriate to further discount the quantity by twenty percent. With this discount, the heroin quantity remains just above 30 kilograms and therefore, still requires a base offense level of 38.

b. *Quantity foreseeable to each defendant*

i. Holland

 I find that over 30 kilograms of heroin and 53 kilograms of crack are attributable to Holland, making his base offense level 38. The existence of the Holland drug organization is supported by the testimony of Lambert, Corbin, Beverly Davis, Antonio Curtis and Steven Jones, as well as audiotaped conversations and con-

trolled buys. Lambert testified that Holland was the leader of the drug organization. He also testified that from 1989 until the summer of 1992, he would sometimes buy his heroin from a member of Holland's group. During the three months leading to the winter of 1992, Lambert testified that he worked as a lookout for Holland, Coates, Deberry, Jones and Hill while they sold heroin and crack. In the winter of 1992, Lambert testified, Holland promoted him to crack dealer and he worked under the supervision of Hill. From the Winter of 1992 until Hill was arrested in October 1994, Lambert testified that he worked under Hill. After Hill's arrest, Lambert supervised the crack sales for Holland. Lambert also testified that after his release from jail in October 1996, he bought drugs from the Holland organization on three occasions, including once from Carroll.[43]

Lambert's testimony regarding the Holland organization was corroborated by the testimony of Antonio Curtis and Beverly Davis, who testified that they bought heroin and crack from workers in Holland's organization. Steven Jones also testified that he was a heroin "tester" for Holland from 1990 until 1993 and a customer of the Holland organization until 1996. Antonio Curtis also testified that he let Holland and Corbin stash heroin in Beverly Davis's house.

The reliability of Lambert's testimony and that of the other witnesses regarding the existence of the organization, its drug activities and Holland's central role is strongly supported by the audiotapes in-

---

**41.** The total weight of the three seizures (9.77 grams) divided by the total number of bags (66) results in an average weight per bag of .148 grams. .148 grams multiplied by 250 bags per day equals 37 grams sold per day.

**42.** .148 grams (average weight per bag) multiplied by 250 bags (Lambert's testimony regarding the number of bags sold per day) results in 37 grams sold per day. 37 grams per day multiplied by 7 days and 148 weeks (November 1992 to September 1995) equals approximately 38 kilograms of heroin.

**43.** Lambert also testified that while he was in jail from September 1995 until October 1996 he kept abreast of the activity in Westport via telephone. From this hearsay, Lambert testified that he learned that Holland was "laying low" and using Coates and Carroll to distribute drugs. I regard this hearsay (and in some cases double hearsay) as unreliable and do not credit it in my determination of drug quantities for Holland, Coates or Carroll.

troduced into evidence at trial. Those tapes, particularly the October 12 and 14, 1994, tapes offer a true and undeniably incriminating look at the Holland drug organization. They depict Lambert, Holland, Jones and others talking about drug distribution strategies (e.g., how many "testers" to distribute and where to distribute them; how much "cut" to use when mixing raw heroin). They also reflect the matter-of-fact way in which buyers would approach the dealers and the consequences of a customer taking to long to select her rock of crack. Based on the testimony of Lambert and others, as corroborated by the audiotapes, I find that Holland was the leader of a drug organization in Westport from at least May 1992 until his arrest on October 24, 1996. I find that his agreement with others encompassed both the sale of heroin and crack, and the amount of crack foreseeable to him was 53 kilograms and the amount of heroin was over 30 kilograms.

### ii. Hill

■ Testimony likewise supports attribution of over 30 kilograms of heroin and 53 kilograms of crack to Hill resulting in a base offense level of 38. Lambert testified that after working as a lookout for Hill in the months leading up to the winter of 1992, he worked as a crack dealer on a daily basis under Hill's supervision as part of the Holland organization from the winter of 1992 until Hill was arrested on October 19, 1994. Stacy Spears corroborated Lambert's testimony by testifying that she bought crack from Hill in 1992.

The reliability of Lambert's testimony as to Hill's central role in the crack distribution of the Holland drug organization are

corroborated again by the audiotapes introduced at trial. Further corroboration of Hill's role as the crack partner in the organization is found in the seizure of 78 grams of crack from Hill's storage locker pursuant to a search warrant executed on October 17, 1994. Accordingly, I find that the distribution of the above quantities was within the scope of Hill's conspiratorial agreement and foreseeable to him.

### iii. Montgomery

■ Because Montgomery did not participate in the conspiracy until 1996, I attribute to him only 22.38 grams of crack, the amount seized during execution of the search warrant at 2628 Maisbury Court on February 8, 1996, and 51 grams of heroin, based on the amount "consigned" during the summer of 1996. Barksdale testified that Montgomery, along with Holland, was in possession of a bag of crack at 2628 Maisbury Court on February 8, 1996. The evidence also established that Montgomery's relationship with Holland continued at least until the summer of 1996. Corbin testified that when a stash of heroin was stolen in the summer of 1996, Holland indicated that, as a result, Holland owed Montgomery $3000. Accordingly, I find that the distribution of the above quantities was within the scope of Montgomery's agreement with Holland and foreseeable to Montgomery.[44]

### iv. Carroll

The evidence makes clear, and the government concedes, that Carroll's involvement in the conspiracy did not begin until 1996. As in the case of Montgomery, I attribute to Carroll 22.38 grams of crack, the amount seized during execution of the

---

**44.** Because both Montgomery and Carroll are "career offenders," computation of their drug quantities resulting in a base offense level below 34 does not affect their sentences. Here, the base offense levels for Montgomery and Carroll are computed by converting the heroin and crack to marijuana and determining the base offense level for that amount of marijuana. U.S.S.G. § 2D1.1, comment (n.10). Each gram of crack is considered 20

kilograms of marijuana. *Id.* Therefore, 22.38 grams of crack is the equivalent of 447.6 kilograms of marijuana. Each gram of heroin is considered one kilogram of marijuana. *Id.* Therefore, 51 grams of heroin is the equivalent of 51 kilograms of marijuana. The base level offense for Montgomery and Carroll, therefore, is the base level offense for 498.6 kilograms of marijuana which is 28.

search warrant at 2628 Maisbury Court on February 8, 1996, and 51 grams of heroin, based on the amount "consigned" during the summer of 1996.

Testimony supports that Carroll was a member of the Holland drug organization beginning in 1996. Lambert testified that after his release from incarceration in October 1996, he bought heroin from Carroll on one occasion. Likewise, Corbin and Steven Jones testified that they purchased Holland's heroin from Carroll and Coates in 1996. Corroboration for the fact that Carroll was distributing heroin in 1996 comes in the form of the audiotaped controlled purchase of heroin by Vance Williams on August 20, 1996. Accordingly, I find that the distribution of the above quantities was within the scope of Carroll's conspiratorial agreement and foreseeable to him.

### v. Jones

██ I attribute over 30 kilograms of heroin and 53 kilograms of crack to Jones resulting in a base offense level of 38. Lambert testified that Jones was a worker for the organization in 1992 and that during the three months leading to the winter of 1992, Lambert was a lookout for Jones. Lambert also testified that from the winter of 1992 until September 1995, Jones worked on a daily basis for the organization. Corroboration takes the form of Stacy Spears's testimony that she bought heroin from Jones in 1992.

As in the case of Holland and Hill, corroboration of Jones's involvement in the conspiracy is made all but absolute by the audiotapes introduced in the trial. Unlike Holland and Hill, however, Jones's involvement was made absolute by his testimony. He confirmed that he was recorded on the audiotape and that he was, in fact, discussing cutting drugs and distribution of test-

ers with Holland. Based on Jones's testimony, the audiotapes and the testimony of Lambert and Spears, I find that distribution of the above amounts of drugs was within the scope of Jones's conspiratorial agreement and foreseeable to him.

### vi. Deberry

██ As with Jones, Lambert testified that Deberry was a worker for the organization in 1992 and that during the three months leading to the winter of 1992, Lambert was a lookout for Deberry. Lambert also testified that from the winter of 1992 until September 1995, Deberry worked on a daily basis for the organization. Nevertheless, I find that there is not sufficient corroboration of Deberry's involvement in the conspiracy to warrant attribution of drug quantities to Deberry until his arrest on February 27, 1994, and the attendant seizure of cocaine. However, this seizure along with testimony that Deberry told a confederate that he had thrown heroin during the chase by law enforcement officers which precipitated his arrest on February 27, 1994, and that heroin was not recovered by the police convinces me, by a preponderance of the evidence, that Deberry was a member of the conspiracy as of late February 1994.[45] Deberry's continued involvement in the conspiracy is supported by Corbin's testimony that he saw Deberry selling crack in front of 2628 Maisbury Court on February 8, 1996. Accordingly, I find that the distribution of the heroin and crack quantities after February 27, 1994, was within the scope of Deberry's agreement and foreseeable to him. Even so limiting the quantity attributable to Deberry, his base offense level remains 38.[46]

### vii. Coates

██ As with Jones and Deberry, Lambert testified that Coates was a worker for

---

**45.** Although this seizure involved powder cocaine, evidence was presented that heroin and powder cocaine were sold together to produce "speedball," a substance which created an increased "high."

**46.** 49 grams distributed per day from May 1992 to October 19, 1994, multiplied by 29 weeks (February 27, 1994 to October 19, 1994) and seven days results in a quantity of 9.94 kilograms of crack. Adding to that amount the 15 kilograms of crack sold during

the organization in 1992. As in the case of Deberry, however, there is not sufficient corroboration of this information in the record for me to find by a preponderance of the evidence that Coates was a member of the conspiracy in its early years. I note that Coates is Holland's half-brother. Even if Coates knew of Holland's drug activities in the early years, simply because a defendant knows that someone he works with sells large amounts of drugs does not make that person liable for the dealer's activities. *United States v. Jones*, 965 F.2d 1507, 1517 (8th Cir.1992), *cert. denied*, 508 U.S. 941, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1993); *United States v. O'Campo*, 973 F.2d 1015, 1025–26 (1st Cir.1992)(defendant's knowledge of "what was going on" insufficient to establish coconspirator liability). Evidence which indicates to me by a preponderance of the evidence that Coates had joined the Holland conspiracy takes the form of Corbin's and Steven Jones's testimony that they bought Holland's heroin from Coates and Carroll in 1996. This evidence is corroborated by the August 20, 1996, audiotaped, controlled buy of heroin by Williams.[47] Accordingly, I find that only distribution of the 1996 quantities of heroin and cocaine were within the scope of Coates's conspiratorial agreement and foreseeable to him. As discussed above, 22.38 grams of crack and 51 grams of heroin result in a base offense level of 28.

### 2. *Periods of Incarceration*

■ Several defendants argue that their periods of incarceration should be excluded when calculating the quantity of drugs attributable to them.[48]

■ "Ordinarily, a defendant is presumed to continue involvement in a conspiracy unless that defendant makes a substantial affirmative showing of withdrawal, abandonment or defeat of the conspiratorial purpose." *United States v. Puig-Infante*, 19 F.3d 929, 945 (5th Cir.), *cert. denied*, 513 U.S. 864, 115 S.Ct. 180, 130 L.Ed.2d 115 (1994)(*quoting United States v. Branch*, 850 F.2d 1080, 1082 (5th Cir. 1988) (citations omitted)). The fact that a defendant is incarcerated is not, by itself, evidence of an affirmative act that the defendant has withdrawn from the conspiracy. *Id.* However, a term of incarceration may have an effect upon a coconspirator's *ability to foresee* the acts of his unincarcerated coconspirators. *Id.* at 946. *See United States v. Brawley*, No. 91–5563 (4th Cir. July 31, 1992)(unpublished)(not clearly erroneous to credit defendant with drug quantities related to activities which occurred while he was incarcerated where he rejoined conspiracy upon release and testimony established thriving drug business in prison system); *United States v. Meacham*, No. 95–16211, 1996 WL 494284 (6th Cir. August 28, 1996)(unpublished)(reasonably foreseeable to a "major player in [the] conspiracy" that enterprise would be maintained while he was incarcerated). *Cf. United States v. Johnson*, 956 F.2d 894, 906 (9th Cir.1992)(jailed coconspirator not held responsible for acts of coconspirators where she was a minor participant).

The evidence supports the view that Holland and Hill were "major players" in

---

the eleven months leading to September 1995, the total amount of crack attributable to Deberry is approximately 25 kilograms. This amount is well-above the 1.5 kilogram floor for attribution of a base offense level of 38.

**47.** The audiotape is some evidence that Carroll and Coates were cooperating in 1996 to distribute heroin. The extent of Coates's voice on the tape is his question at the very end asking, "Where Duane go at?" Although Coates did not hand the heroin to Williams on August 20, 1996, the tape suggests that he worked with Carroll to supply the heroin to Williams.

**48.** Jones was incarcerated for six months from early 1994 until his release in the summer. Hill was incarcerated from October 19, 1994, to August 16, 1996. Holland was incarcerated from July 1993 until November 1993. Coates was also incarcerated at some point between May 1992 and March 1997.

the conspiracy. *See* § B, *infra.* Accordingly, I find that it would be reasonably foreseeable to them that the conspiracy would be maintained while they were incarcerated. In fact, the evidence showed that Won Lee was selected by Holland to replace him as the leader of the organization in Westport while Holland was incarcerated. Once released, the evidence showed, Holland chased Won Lee out of Westport and resumed control over the drug distribution activities in Westport. Thus, time of incarceration for Holland and Hill should not be deducted when calculating drug quantities attributable them.

The remaining defendants convicted of conspiracy (Montgomery, Carroll, Jones, Deberry and Coates) indisputably played lesser roles in the conspiracy. Accordingly, any time of incarceration for these defendants should be deducted when calculating the drug quantities attributable to them. I note, however, that in no instance will the deduction for these time periods materially effect the sentence of a defendant. As the government notes, to reach 30 kilograms of heroin (and level 38) by the government's calculations, one would only have to participate in the conspiracy for 103 weeks; to reach 1.5 kilograms of crack (and level 38), one would only have to participate in the conspiracy for five weeks.

### 3. *Multiple conspiracies*

Several defendants suggest that I should consider the heroin conspiracy as distinct from the crack conspiracy and attribute to them only the type of drug with which the evidence indicated that they were actually involved.

"A single conspiracy exists where there is 'one overall agreement,' or 'one general business venture.' Whether there is a single conspiracy or multiple conspiracies depends upon the overlap of key actors, methods, and goals." *United States v. Leavis*, 853 F.2d 215, 218 (4th Cir.1988) (citations omitted).

As reflected in my refusal to give a multiple conspiracy jury instruction, my view is that the evidence presented at trial indicated the existence of only one conspiracy. While the evidence did not establish that each of the participants knew one another and specifically agreed with each other conspirator that they were part of the same conspiracy, that is not required. The evidence established that each of the participants served the single conspiratorial goal of distribution of illegal drugs at the street level (both heroin and crack) in Westport with the understanding that the drugs they were distributing were in fact and were regarded by consumers in Westport as "Holland's drugs." For purposes of sentencing, I find that membership in the Holland drug organization encompassed the distribution of both heroin and crack.

### 4. *The effect of the Corbin plea agreement as to drug quantity*

Holland argues that the stipulation of facts accepted by the court in connection with the Corbin plea agreement, discussed *infra,* as it relates to drug quantity, is binding for purposes of this court's determination of the amount of drugs attributable to the conspiracy post-trial. He argues that his base offense level should be no higher than 34 because the government and Corbin have stipulated, and the court accepted at Corbin's sentencing which occurred post-trial, that the appropriate level is 34.

In connection with Corbin's plea agreement, the government stipulated with Corbin that Corbin "knew or could reasonably have foreseen that the equivalent of at least three (3) kilograms of heroin, but less than ten (10) kilograms, were involved in this offense. This quantity of heroin results in a base offense level of 34." Def's Mot. New Trial Based on Newly Discovered Evid. at Ex. F, p. 3.

Holland contends that the Sentencing Guidelines, the "Thornburgh Memoran-

dum" and F.R.E. 801(d)(2) bind the government to its representations. U.S.S.G. § 6B1.4 states that "a plea agreement may be accompanied by a written stipulation of facts relevant to sentencing. Except to the extent that a party may be privileged not to disclose certain information, stipulations shall: (1) set forth the relevant facts and circumstances of the actual offense conduct and offender characteristics; [and] (2) not contain misleading facts." The commentary to § 6B1.4 states:

> This provision requires that when a plea agreement includes a stipulation of fact, the stipulation must fully and accurately disclose all factors relevant to the determination of sentence. This provision does not obligate the parties to reach agreement on issues that remain in dispute or to present the court with an appearance of agreement in areas where agreement does not exist. Rather, the overriding principle is full disclosure of the circumstances of the actual offense and the agreement of the parties. The stipulation should identify all areas of agreement, disagreement and uncertainty that may be relevant to the determination of sentence. Similarly, it is not appropriate for the parties to stipulate to misleading or non-existent facts, even when both parties are willing to assume the existence of such "facts" for purposes of litigation. Rather, the parties shall fully disclose the actual facts and then explain to the court the reasons why the disposition of the case should differ from that which such fact ordinarily require under the Guidelines.

U.S.S.G. § 6B1.4, comment (¶ 1).

Holland further notes that stipulations must be accurate and if they are not, the sentencing court has an independent obligation to correct any inaccuracies. *See, e.g., United States v. Telesco,* 962 F.2d 165, 168 (2d Cir.1992)(policy of § 6B1.4(a) violated where stipulation entered agreeing to lower amount of drugs and government planned to argue for higher amount, however, no prejudice resulted because plea agreement warned that other factors may be brought to the court's attention for sentencing); *United States v. Sandles,* 80 F.3d 1145, 1149 (7th Cir.1996)(noting that § 6B1.4 states that sentencing court cannot rely solely on stipulations in ascertaining factors relevant to sentencing, but should consider the stipulation along with the PSR and any other relevant information).

Holland further argues that the "Thornburgh Memorandum," which is embodied in the "Principles of Federal Prosecution" at § 9–27–310 of the Department of Justice Manual requires that "the attorney for the government shall charge ... the most serious offense that is consistent with the nature of the defendant's conduct and that is likely to result in a sustainable conviction. The 'most serious' offense is generally that which yields the highest range under the Sentencing Guidelines." Furthermore, according to Holland, F.R.E. § 801(d)(2) binds the government to its representation that the base offense level for all members of the conspiracy is 34. *See United States v. Blood,* 806 F.2d 1218 (4th Cir.1986)(noting that "an attorney's judicial admissions ... like any stipulation, can bind a party within a given lawsuit ..." but holding that the government had made no such admission.)

The government responds that offense level computations in Corbin's plea agreement should not substitute for evidence presented at trial. Corbin's plea agreement was executed on July 30, 1997. I accepted his guilty plea on August 1, 1997. The stipulation contemplates a conspiracy involving 3 to 10 kilograms of heroin. Trial testimony showed a conspiracy to distribute at least 30 kilograms of heroin and at least 1.5 kilograms of crack resulting in base offense level of 38 for either substance. The government argues that the trial testimony should be used to determine drug quantities, not Corbin's stipulation.

I find that the trial testimony should be used to determine the quantities of drugs

attributable to the defendants, and Corbin's stipulation does not bind the government, and certainly not the court, to attribute the same quantity of drugs to the other defendants. Of equal significance, I sentenced Corbin pursuant to a U.S.S.G. § 5K1.1 departure. Accordingly, although I was bound, as I always am, by the Sentencing Guidelines in general, my determination of Corbin's sentence did not turn on my acceptance or rejection of the drug quantity stated in his stipulation of facts. I was permitted under § 5K1.1 to sentence Corbin as I saw fit. Accordingly, I find that drug quantity should be determined based upon the testimony adduced at trial.[49]

## B. ROLE IN THE OFFENSE

■ If a defendant was an organizer or leader of activity involving five or more participants or was otherwise extensive, a four level increase in his or her base offense level may be applied. U.S.S.G. § 3B1.1(a). If a defendant was a manager or supervisor of activity involving five or more or was otherwise extensive, a three level increase may be applied. U.S.S.G. § 3B1.1(b). If a defendant was an organizer, leader, manager or supervisor in any criminal activity, a two level increase may be applied. U.S.S.G. § 3B1.1(c). More than one person can qualify as a leader. U.S.S.G. § 3B1.1, comment (n. 4). To determine if a defendant played a leadership role I may consider:

(1) the exercise of decision making authority;

(2) the nature of the participation in the commission of the offense;

(3) the recruitment of accomplices;

(4) the claimed right to a larger share of the fruits of the crime;

(5) the degree of participation in planning or organizing the offense;

(6) the nature and scope of the illegal activity; and,

(7) the degree of control and authority exercised over the others.

*Id.*

The government argues that Holland and Hill should receive a four level increase because the conspiracy clearly involved five or more participants and the evidence at trial established that Holland and Hill had leadership roles in the drug distribution organization. Specifically, Lambert and Corbin testified that they took direction from Holland or Hill, depending on the drug being sold. Beverly Davis, Steven Jones, Antonio Curtis and Colethar Gilliam testified the they bought "Holland's drugs," they saw Holland directing his dealers and addressed Holland when they had complaints about the drugs.

With respect to Hill, the government argues that the evidence showed that Hill was Holland's partner, not merely a managing employee. Furthermore, Hill had primary responsibility for getting crack to the buyers and directly supervised daily drug activity for 28 months from May 1992 until his arrest on October 19, 1994.[50]

I find that both Holland and Hill exercised significant leadership roles in the organization. They cooperated as partners in an effort to distribute both heroin and crack in Westport. Trial testimony indicated Hill oversaw the crack aspects of the organization while Holland oversaw the heroin aspects. Trial testimony reflected that members of the conspiracy took their "marching orders" from Holland. When heroin was missing from its "stash" location in the summer of 1996,

---

49. To the extent that the defendants argue that other aspects of Corbin's plea agreement or the stipulation of facts therein binds the government or this court to apply the same factors in their sentencing, for the reasons stated in text, I disagree.

50. Hill argues that this enhancement should not apply because paragraph 6 of the PSR lists only four people as involved in crack distribution rather than the required five people. Although Hill accurately reports the contents of the PSR, trial testimony clearly established that the drug distribution conspiracy involved more than five participants.

Holland was informed. Testimony further indicated that when "customers" had a problem or comments about the quality of the drugs being distributed by the organization, they went to Holland. Likewise, trial testimony indicated that Harrison Conyers, among others, worked under Hill's supervision when selling crack. For these reasons along with those argued by the government, I find that Holland and Hill exercised leadership roles in the conspiracy, and I apply a four level increase to their base offense levels.[51]

### C. CROSS REFERENCE TO U.S.S.G. § 2A1.1

U.S.S.G. § 2D1.1(d)(1) instructs that I apply a cross reference to first degree murder, U.S.S.G. § 2A1.1, with a base offense level of 43, where a killing occurs [in the course of a drug trafficking conspiracy] "under circumstances that would constitute murder under 18 U.S.C. § 1111." However, where a defendant does not knowingly or intentionally engage in the killing, a downward departure to the base offense level for second degree murder, U.S.S.G. § 2A1.2, is warranted. U.S.S.G. § 2A1.1, comment (n.1). In no instance, however, can the base offense level be lower than the base offense level for the underlying offense. *Id.*

The jury's acquittal of a defendant on a murder count of an indictment does not prevent a sentencing court from considering conduct underlying the charged crime, so long as that conduct has been proved by a preponderance of the evidence. *United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 637, 136 L.Ed.2d 554

(1997). However, the preponderance of evidence standard is appropriate only so long as the sentencing enhancement is not "the tail which wags the dog of the substantive offense." *Id.* at n. 2 (quoting *McMillan*, 477 U.S. 79, 88, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986))(suggesting that the clear and convincing standard of proof should be applied when considering acquitted conduct which would substantially increase a defendant's sentence).

The government argues that the cross reference to murder should apply to Holland. Accordingly, his offense level should be 43. The government argues that the evidence indicated that three eyewitnesses testified that Holland shot Woodson, three witnesses testified about Holland discussing the murder with them, and the physical evidence supports a finding by a preponderance of the evidence that Holland premeditatedly and with malice aforethought killed Woodson in furtherance of the drug conspiracy.[52]

The government argues that the cross reference should also apply to Hill, Jones, Deberry and Coates giving each of them a base offense level of 43.[53] The government's view is that it was foreseeable to these defendants that an armed coconspirator would shoot at someone who attempted to rob a member of the organization of drugs and/or money. U.S.S.G. §§ 2D1.1(d)(1), 1B1.3 (a)(1)(B) and 2A1.1(a). However, the government argues that, for Coates and Deberry, a downward departure to base offense level 38 is warranted because "the defendant" did not knowingly or intentionally cause death. U.S.S.G. § 2A1.1, comment (n.1).

---

**51.** Even if I were to give Hill an increase of only 3 levels under this section, his sentence would not be materially effected. His base offense level of 38 with a three level increase under this section and a two level increase for obstruction of justice results in the maximum offense level of 43.

**52.** The government argues in its sentencing memorandum that I should also consider Holland's "confession" to murder on the September 4, 1996 audiotape. However, the

government conceded at the consolidated hearing held on July 17, 1998, that such consideration is inappropriate given that I suppressed the tape as a violation of Holland's Sixth Amendment right to counsel.

**53.** The government concedes that Montgomery and Carroll are not liable for murder because they were not members of the conspiracy at the time of the murder.

However, the base offense level should not be below that for underlying the offense of distribution of over 1.5 kilograms of crack, which is 38. The government argues that a departure is not warranted for Holland (leader of the organization with individual responsibility for the murder), Jones (accomplice to the murder by providing bullets) or Hill (made post-murder attempts to intimidate Paula Johnson and Stacy Spears).

■ Holland argues that the court should require the clear and convincing standard of proof when using acquitted conduct which would substantially increase a defendant's sentence. *See Watts*, 117 S.Ct. at 637–38 & n. 2. Reliance on the murder as relevant conduct would increase the base offense level from 34 (Holland's position) or 38 (government's position) to 43. Because the increase in sentence is substantial, Holland argues, the clear and convincing standard should apply.

Holland argues that the facts do not support application of the cross reference to Holland.[54] Holland further argues that the death of Woodson was not "relevant conduct." The evidence showed Howard Horton (the Holland dealer who was the victim of the robbery committed by Woodson just prior to Woodson's death) sometimes dealt for others and he may have been doing so on the night of the murder (i.e., if he was not dealing for Holland that night, such a killing is not "relevant" to the Holland conspiracy). As further support for this argument, Holland notes that the

drugs found near Woodson had green packaging, however, no witness testified that Holland ever used green packaging and no witness testified at trial that the bags found near Woodson belonged to Holland. Furthermore, Holland notes, Beverly Davis testified that Horton was mentally unbalanced and would kill for good reason, bad reason or no reason at all. Holland also argues that even if Horton was acting for Holland, Horton (who fired at and apparently wounded Woodson, preventing his escape) acted in self-defense, or committed voluntary manslaughter or second degree murder, not first degree murder.

Jones argues that U.S.S.G. § 2A1.1 should not apply because the government has not proven, by a preponderance of the evidence, that Jones participated in Woodson's murder. Corbin was the only witness who even mentioned that Jones was present on the night of the murder. Jones was not mentioned by Corbin until Corbin gave his third version of relevant events.

Because I have found that the government did not establish by a preponderance of the evidence that Coates and Deberry were members of the conspiracy at the time of the murder in February 1993, I will not apply the cross reference to them. I find that the 1993 murder was not foreseeable to them.

I find that the preponderance of evidence standard applies to my consideration of the acquitted conduct (the alleged murder) in this case. The cross reference is sought against Holland, Hill and Jones. Without the cross reference, these defen-

---

**54.** Holland emphasizes the following argument, evidence and inferences: Holland was acquitted of the murder charge. The government's pathologist, Dr. King, testified that Woodson was killed by a gunshot which entered his back, striking his thoracic aorta and causing the loss of 30–40% of his blood. That shot was, in all probability, inflicted by Horton while Woodson was running. The June 26, 1993, Maryland Application for Statement of Charges for Holland states that Woodson was shot "during the course of" the robbery. Antonio Jones testified that he saw Horton running after Woodson with a gun in his hand and heard gunshots. Woodson's other

wounds were "essentially non-fatal." If Horton fired the killing shot, Holland could not have committed first degree murder; at most he could have committed attempted murder or attempted manslaughter.

Although two government witnesses, Corbin and Redmond, testified that they saw Holland shoot Woodson, their testimony lacks credibility. Corbin initially denied Holland was involved in Woodson's death, then stated that Holland shot Woodson in the head, then told three different versions as to who supplied the bullets: first an unknown person, then "Short Dog" (Gerard Brightful), and finally, Kevin Jones.

dants are still exposed to substantial sentences in this case based upon the base offense level of 38. Increases of four levels are appropriate for their leadership roles (Holland and Hill) and two levels for obstruction of justice (Hill and Jones). Applying these enhancements alone (and not yet applying an enhancement for possession of a firearm), Holland's offense level is 42 which, with any criminal history score, results in a sentencing range of 360 months to life. Hill's offense level is 44, which results is a life sentence. Finally, Jones's offense level is 40 which, with his criminal history of I, results is a sentencing range of 292 to 365 months. Accordingly, the application of the cross reference does not increase the sentences of the defendants in a way which requires that I apply a heightened standard of review.[55]

■ In any event, I find that the evidence presented at trial established by the

---

**55.** I note that in *United States v. Fenner,* 147 F.3d 360, 365 (4th Cir.1998), the Fourth Circuit addressed application of a cross reference to the homicide guidelines contained in U.S.S.G. § 2K2.1(c)(1)(B) where the defendants were not convicted of the homicide. Ultimately, the court held that it need not vacate the defendants' sentences because the district court mistakenly believed that it lacked the authority to depart downward where, if it had done so, the departure would have constituted an abuse of discretion. *Id.* at 367.

On the issue of the standard of proof, the *Fenner* court stated "... it can be said that sometimes the prosecution must bear the burden of proving beyond a reasonable doubt facts bearing upon sentencing even though such facts do not establish an element of the offense. The precise due process limitations on the allocation or standard of proof for facts that bear on the degree of criminal culpability but that are not defined by law as an element of the offense have not been clarified, however." *Id.* at 366. However, the Court did not elaborate. It noted, "the Fenners raised no argument concerning the standard of proof that must be satisfied in order to impose the enhancement resulting from the § 2K2.1(c)(1)(B) cross reference consistent with due process. This omission is no doubt the result of the district court finding beyond a reasonable doubt that the Fenners were responsible for Holley's death." *Id.* at n. 3.

On the issue of whether a due process violation can be incurred by imposition of a cross reference, the Court discussed, *inter alia, United States v. Lombard,* 72 F.3d 170 (1st Cir.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 2437, 138 L.Ed.2d 197 (1997). *Id.* at 367–68. In that case, the First Circuit held that "a district court had erred in ruling that it lacked authority to depart downward from the guideline range that resulted from an application of the § 2K2.1(c)(1)(B) cross reference when the extent of the enhancement to the guideline range was so great that it resulted in a violation of due process." *Id.* The *Lombard* court reasoned that the cross refer-

ence was impermissibly the "tail which wags the dog of the substantive offense." *Id.* at 368 (*quoting McMillan,* 477 U.S. at 88, 106 S.Ct. 2411). In *Lombard,* the application of the cross reference augmented the defendant's guideline range from 262–327 months to a mandatory life sentence. *Id.* at 367. However, the Fourth Circuit distinguished *Lombard,* stating that "*Lombard,* however, presents a different situation than that presented here, and we need not resolve the issue presented in Lombard to conclude that the Fenners faced no due process violation in the application of the ... cross reference." *Id.* Terry Fenner was subjected to an increase from 42 years to 55 years imprisonment and his brother, Herbert Fenner, was subjected to an increase from 115 months to 210 months imprisonment. *Id.* at 366. The court went on reasoning that, "[b]ecause the statutory maximum term of imprisonment to which the Fenners were subjected was far less than the sentence of life imprisonment to which Lombard was exposed, the application of the § 2K2.1(c)(1)(B) cross reference did not implicate an increase in criminal culpability in kind or degree similar to the enhancement at issue in *Lombard.*" *Id.* at 367.

*See also United States v. Meyer,* 149 F.3d 535 (7th Cir.1998)(holding that cross reference under § 2D1.1(d)(1) to first degree murder where the defendant was never charged or convicted of the murder does not violate his right to due process; noting that "without consideration of the murders, [defendant] Hoff would have scored an offense level of 39. An increase from level 39 to level 43 is not the type of drastic increase which would allow the sentencing enhancement to become the tail which wags the dog of the substantive offense.").

As I indicate in text, without suggesting that, were I the fact finder, I would have had a reasonable doubt as to whether Holland murdered Woodson as the government theorizes, I have no hesitation in concluding that the government's proof satisfied the "clear and convincing" standard.

clear and convincing evidence standard that Holland fired the shot which killed Antonio Woodson. Although Corbin's credibility regarding his recollection of the murder was impeached in some regards, Lavar Redmond's was not. Redmond testified unequivocally that he saw Holland fire at Woodson as he lay against the fence along Nevada Street pleading with Holland for his life. I found his testimony and much of Corbin's testimony credible. I further find that the government established by clear and convincing evidence that Holland killed Woodson because Woodson disrupted Holland's drug distribution activity in Westport by robbing Howard Horton, one of Holland's confederates. Thus, I find that the killing is "relevant conduct" for sentencing purposes. Accordingly, I find that Holland inflicted the wounds to Woodson which caused his death, and I find that he did so intentionally, with premeditation and deliberation. For these reasons, I find that the cross reference under U.S.S.G. § 2D1.1(d)(1) applies to Holland despite his acquittal at trial on the murder charge.

■ I further find that the cross reference should apply to Jones and Hill. As discussed at A(1)(b), *supra*, testimony established that Jones and Hill were members of the conspiracy as of February 1993. Testimony established that much of Jones's role in the conspiracy was that of "enforcer." It was Jones who would inflict beatings on would-be customers for taking "testers" from Holland (but who then purchased their drugs from a competing dealer), or who would discipline members of the conspiracy, such as Lambert, by beating them up. Furthermore, there was testimony that Jones often carried or had access to guns to reinforce his role as "the enforcer" of the organization. Additionally, Jones's role as the enforcer and his affinity for guns is captured on the audiotapes introduced at trial. Accordingly, I find that the murder of Woodson for robbing one of Holland's drug dealers was foreseeable to Jones and the cross reference under § 2D1.1(d)(1) applies to Jones, making his offense level 43.

■ The cross reference under § 2D1.1(d)(1) also applies to Hill. Like Jones, Hill was a member of the conspiracy at the time of the murder; also like Jones, Hill armed himself. The testimony established that shortly after the murder of Woodson, Hill met with Paula Johnson. Johnson testified that Hill attempted to influence her communications with law enforcement regarding the Woodson murder so as not to implicate Holland. *See United States v. Harris,* 104 F.3d 1465, 1474–75 (5th Cir.1997)(holding that a cross reference to murder is appropriate in connection with bank robbery, under U.S.S.G. § 2B3.1(c), where defendant was not present at robbery and murder, did not know about robbery and murder until after they happened and was convicted of accessory after the fact of robbery for, *inter alia,* attempting to prevent a witness from talking with the FBI about a co-defendant's whereabouts; but noting that even with the cross reference, the maximum base offense level permitted under the Guidelines was 30). Accordingly, I find that the cross reference to first degree murder applies to Hill.

### D. POSSESSION OF FIREARM

Sentencing Guidelines § 2D1.1(b)(1) allows for an increase of two levels where a "dangerous weapon" is possessed in connection with a conspiracy to distribute drugs. "This adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."

"The basis for holding defendants liable for firearms possession by co-conspirators is the same as the basis for holding defendants liable for drug transactions by co-conspirators: that the conduct was reasonably foreseeable and in furtherance of the conspiracy. Thus, to hold a defendant liable for possession of firearms by co-conspirators, the district court must make the same individualized findings as with re-

spect to drug transactions: that the conduct was within the scope of that defendant's conspiratorial agreement and that it was reasonably foreseeable." *United States v. Childress*, 58 F.3d 693, 724–25 (D.C.Cir.1995), *cert. denied*, 516 U.S. 1098, 116 S.Ct. 825, 133 L.Ed.2d 768 (1996).

■■■ A firearms enhancement may be applied based upon possession of a weapon, though not actual possession, so long as the possession was reasonably foreseeable to the defendant. *United States v. White*, 875 F.2d 427, 433 (4th Cir.1989)(holding that narcotics defendant, who pled guilty to aiding and abetting codefendant who had gun under seat of car in which defendants were arrested, could properly be found to be in possession of firearm, for purposes of sentence enhancement, where gun was equally accessible to both and both were acting in concert with respect to the underlying narcotics offense). *See also United States v. Nichols*, 979 F.2d 402, 412–13 (6th Cir. 1992), *cert. denied*, 509 U.S. 953, 114 S.Ct. 39, 125 L.Ed.2d 788 (1993) ("This court has consistently held that possession of a firearm ... is attributable to a co-conspirator not present at the commission of the offense as long as it constitutes reasonably foreseeable conduct;" holding possession foreseeable where co-defendant asked Nichols immediately prior to the drug deal whether he should carry a gun with him and Nichols responded that he should do whatever he wished and where Nichols had bought guns from co-defendant); *United States v. Soto*, 959 F.2d 1181, 1186–87 (2d Cir.1992)(holding firearms enhancement not clearly erroneous where defendant lacked actual knowledge of presence of gun in apartment where he was packaging crack, large quantities of narcotics were present and three types of ammunition were strewn about the apartment); *United States v. Aguilera–Zapata*, 901 F.2d 1209, 1215–16 (5th Cir.1990)("Sentencing courts ... may ordinarily infer that a defendant should have foreseen a co-defendant's possession of a dangerous weapon, such as a firearm, if the government demonstrates that another participant knowingly possessed the weapon while he and the defendant committed the offense by jointly engaging in concerted criminal activity involving a quantity of narcotics sufficient to support an inference of intent to distribute."). Furthermore, evidence of a drug conspiracy involving sales of large amounts of drugs will support conclusion that use of weapons by coconspirators was reasonably foreseeable. *See e.g., Childress*, 58 F.3d at 725 (finding foreseeability where defendant personally handled 35 kilograms of cocaine at one time and "a couple of million dollars" another time); *White*, 875 F.2d at 433 (300 grams).

The government argues that a two level increase should apply to all defendants because use of firearms was foreseeable to each; the organization often had armed enforcers in Westport, and there are many references in the record to purchases of firearms and use of baseball bats to beat people.

Holland's position is that testimony showed that Holland never actually possessed or used a firearm. Holland further argues that he was incarcerated during part of the conspiracy and there was no evidence that firearms were used in furtherance of the conspiracy *when Holland was a member.*

Similarly, Carroll argues that the two level increase should not apply because there was no evidence that Carroll committed any violent acts, ever possessed a firearm, or was in the vicinity where violence took place. The government agrees that Carroll did not join the conspiracy until 1996. As such, he argues, he could not have participated in any of the acts of violence testified about at trial. Coates likewise argues that the two level increase should not apply because there was no evidence that the possession of weapons was in furtherance of the conspiracy or foreseeable to Coates. Hill's view is that the enhancement should not apply because

the possession of weapons was in connection with the heroin transactions, not crack transactions.

 I find that an enhancement is appropriate where the testimony showed, by a preponderance of evidence, that there was actual possession of a firearm by a defendant. Likewise, the enhancement applies to the defendants to whom I have determined that the § 2D1.1 (d) cross reference applies. Accordingly, I find that this enhancement applies to Holland, Hill and Jones. Furthermore, the enhancement applies to all defendants in the conspiracy because it was foreseeable, apart from the murder, that firearms would be used in connection with the conspiracy. Trial testimony established, by a preponderance of the evidence, that throughout the conspiracy, guns and baseball bats were used by and accessible to the conspirators and were to be used to further the organization's effort to distribute drugs. Accordingly, I apply a two level increase under U.S.S.G. § 2D1.1(b)(1) to the base offense level for each defendant.

### E. OBSTRUCTION OF JUSTICE

A two level upward adjustment is applied when a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. The two level increase applies for "(a) threatening, intimidating, or otherwise unlawfully influencing a ... witness ..., directly or indirectly, or attempting to do so; [and] (b) committing ... perjury." *Id.* at comment (n.3).

 A witness who testifies under oath or affirmation commits perjury when he or she: (1) gives false testimony; (2) concerning a material matter; (3) with the willful intent to deceive, rather than as a result of confusion or mistake. *United States v. Dunnigan,* 507 U.S. 87, 92–98, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). Where the court finds perjury, it must

make specific findings as to the elements of perjury or make a single global finding that recognizes all three elements. *See United States v. Stotts,* 113 F.3d 493, 498 (4th Cir.1997).

The government argues that this enhancement should apply to Holland, Hill and Jones. Specifically, the government argues that Holland attempted to intimidate Paula Johnson, a witness to Woodson's shooting, by being present in the room when Hill spoke with her in an intimidating manner. Hill attempted to intimidate Paula Johnson both near the time of murder and three years later, after Holland's federal arrest, and Hill also attempted to intimidate Stacy Spears into hiding information about Holland's involvement in the murder. The government also argues that Kevin Jones's testimony that he was not part of the Holland organization contradicts the October 12, 1994, recorded conversation in which Jones spoke at length on topics such as getting drugs from New York, the violence of the organization and the drug clientele in Maisbury Court. Additionally, the government argues that Jones's denial of heroin use while at the detention center contradicted medical records from BCDC, and his denial of violent acts was incredible. Finally, the government argues that Jones's feigned memory loss when, during cross-examination, the court was required to instruct him to identify the person who bought a gun for him, amounted to obstruction of justice.

Holland responds that the PSR description of Paula Johnson's testimony is inaccurate. She specifically testified that Holland did not threaten her and that she did not feel threatened by his brief presence at a meeting at which she was questioned by Hill regarding the Woodson shooting. Holland was not present when Hill urged Johnson to make untruthful statements to the police. Additionally, Johnson did not inculpate Holland so there is nothing for Holland to obstruct. Johnson testified that Holland was present at the time of

the killing but that she had no first hand knowledge about Holland's role in Woodson's death. Furthermore, there was no evidence that Holland threatened anyone himself or that he "counseled, commanded, induced, procured or willfully caused" threats to be made by Hill.

 I find that the obstruction of justice two level increase should be applied to Hill and Jones. I credit the testimony of Paula Johnson that she was summoned to a room in Westport and encouraged, if not threatened, by Hill to give false information to police regarding Woodson's killing. I also credit her testimony that Holland was present during part of the conversation between Hill and Johnson. However, I decline to apply the enhancement to Holland. I do not regard his mere presence for a portion of a conversation at which there was an attempt to influence a witness's testimony as an obstruction of justice.

 I regard Jones's trial testimony as an attempt to obstruct justice. Although I find that Jones lacked credibility regarding the reason for his medical attention at BCDC and his memory loss when I instructed him to state from whom he purchased a gun, these do not serve as the basis of my finding because they were not material. I find, however, that Jones's denial of membership in the Holland drug conspiracy, after his admission that the October 12, 1994, audiotape accurately reflects his conversation with Holland is material, is false and was stated with a willful intent to deceive. Accordingly, I find that Jones committed perjury, and I apply a two level increase to his offense level.

## F. CAREER OFFENDER

 A defendant is a career offender when he has two prior felony convictions for either a crime of violence or controlled substance violation, is convicted of same and was at least 18 when he committed the instant offense. U.S.S.G. § 4B1.2(a). A "crime of violence" is any offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 4B1.2(a). To determine whether a prior offense qualified as a crime of violence, the Fourth Circuit, following *Taylor v. United States*, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), has required the use of a "categorical approach, relying only on (1) the fact of the conviction and (2) the definition of the prior offense." *United States v. Kirksey*, 138 F.3d 120, 124 (4th Cir.1998), *pet. for cert. filed* June 8, 1998. The Maryland crime of assault is not, on its face, sufficient to qualify as a crime of violence under U.S.S.G. § 4B1.2. The sentencing court may rely on the Maryland Statement of Charges to determine whether the assault included violence "against the person of another." *Kirksey*, 138 F.3d at 126.

The government argues that Holland, Carroll and Montgomery should be sentenced as career offenders. Montgomery's PSR reflects that he was convicted of PWID cocaine in Baltimore City Circuit Court in 1988 and again in 1989. It also reflects that he was over 18 years of age at the time of this offense. Accordingly, Montgomery qualifies as a career offender.

 As for Holland, a look at the Maryland statement of charges indicates that his assault conviction is a crime of violence. The statement of charges recites that Holland challenged one Albert Turner to fight and shot at him. Thus the prior conviction has "as an element the use, attempted use, or threatened use of physical force against the person of another, or . . . involves conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(1).[56] Holland

---

56. Holland asserts that his 1984 assault conviction is not a "crime of violence." Holland was charged with assault with intent to murder, attempted murder, assault, use of handgun in commission of crime, unlawful carrying of a handgun, and malicious destruction of property. The allegations were that Holland wanted to fight with Turner. When Turner refused, Holland shot out the window of Turner's car. When Turner protested, Hol-

also argues that a downward departure from criminal history category VI to criminal history category III is warranted because Holland is an atypical "career offender." He argues that he only has two prior convictions: 1984 assault (12 years before this conspiracy ended) and 1986 possession of heroin (a guilty plea involving 32 grams).

I find that Holland is a career offender and a downward departure is not warranted. His conviction for possession of heroin was just six years before the beginning of the conspiracy for which he was convicted in this case, and his assault conviction was based upon facts which included threatened physical violence and use of a gun. Although Holland's prior record does not present anywhere near the strongest case for application of career offender status, his prior record puts him squarely within that status.

In Carroll's case, the government argues that Judge Maletz erred in departing downward from the career offender range when he sentenced Carroll in 1997. The government believes that I should apply the career offender provision when sentencing Carroll based upon my review of his record.

Carroll asks that I reserve ruling on his career offender status until the appeal of Judge Maletz's departure from the career offender status is ruled upon by the Court of Appeals. *Carroll I* is still on appeal. In the alternative, Carroll argues that I should depart from the career offender classification, as Judge Maletz did, because he is not a typical "career offender." Carroll further argues that I should depart from the guideline range because "Carroll has already been sentenced and punished for the very same conduct that he was convicted of in this case." He argues that in the case before Judge Maletz, Carroll

was convicted of distribution of heroin on August 20, 1996, and distribution of powder cocaine on September 25, 1996, two of the overt acts proven in the Holland trial.

I find that Carroll qualifies as a career offender. He was convicted of assault, a crime of violence, in 1992 and of distribution of a controlled dangerous substance in 1993. However, Carroll aptly notes that in *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 2050–53, 135 L.Ed.2d 392 (1996), the Supreme Court stated that successive prosecution in state and federal court for the same offense is a proper basis for a downward departure. The Court reasoned that where there was a lengthy trial in state court for the same offense which took a toll on the defendants and resulted in acquittal, the District Court did not abuse its discretion in taking this into consideration at sentencing. Carroll argues that the Supreme Court's reasoning in *Koon* applies with equal force in the situation presented here: successive prosecutions involving the same conduct but not alleging the same offenses. *See Holland*, 985 F.Supp. at 591–92. Carroll argues that the emotional "toll" of the first trial should be considered in sentencing in the instant case. I will hear further argument from the parties on this and related issues at Carroll's sentencing.

### G. MINIMAL PARTICIPATION

Guidelines § 3B1.2 permits a downward departure of two to four levels based on a defendant's "mitigating role" in the offense. Montgomery and Deberry request a U.S.S.G. § 3B1.2 downward adjustment for minimal participation. Montgomery asks that I apply U.S.S.G. § 3B1.2(a) and grant a downward departure of four levels. Montgomery analogizes his situation to the example in application note 2, describing a defendant who off-loaded one shipment of

---

land fired two shots at Turner, who ran away. Holland elected a non-jury trial and was found guilty of "simple" assault, carrying an unlawful weapon and malicious destruction of property. Holland seems to argue, consequently, that he was convicted of shooting at a car, not a person, therefore, U.S.S.G. § 4B1.2(a)(1) is inapplicable. I find this argument unavailing.

drugs during a very large drug conspiracy would be deemed to be a minimal participant.

██ I find that Montgomery should not receive a downward departure for minimal participation. The evidence established that Montgomery, along with Holland, was in possession of a large quantity of crack at 2628 Maisbury Court on February 8, 1996. The evidence also established that Montgomery's relationship with Holland continued at least until the summer of 1996. Corbin testified that when a stash of drugs was stolen Holland indicated that, as a result, Holland would owe Montgomery $3000. This continuing relationship between Holland and Montgomery belies minimal participation, and accordingly, I will not grant Montgomery a downward departure on that basis.

██ Similarly, the testimony established that Deberry has had more than tangential involvement with the Holland drug organization. Deberry was arrested on February 27, 1994, and cocaine was seized from his pocket. Testimony at trial indicated that Deberry told a confederate that he had thrown heroin during the chase with law enforcement which precipitated his arrest on February 27, 1994, and that heroin was not recovered by the police. The fact of Deberry's continued involvement in the conspiracy is supported by Corbin's testimony that he saw Deberry selling crack in front of 2628 Maisbury Court on February 8, 1996. Accordingly, I find that the testimony supports the conclusion that Deberry was more than a minimal participant in the Holland drug organization.

## H. CRIMINAL HISTORY POINTS

Guidelines § 4A1.1 provides, *inter alia*, for increases of one to three points to a defendant's total criminal history points for commission of an offense while "under any criminal justice sentence" or within two years of release from imprisonment. Deberry argues that an increase in crimi-

nal history points should not apply. Deberry was paroled April 18, 1991, and remained on parole until October 4, 1993. Because I found that Deberry's start date in the conspiracy was February 24, 1994, after the termination of his parole and more than two years after his release from imprisonment, I find that an increase in criminal history points under U.S.S.G. § 4A1.1 should not apply to Deberry. Without these criminal history points, Deberry's prior record results in a criminal history score of 5 and a Criminal History Category of III.

Because I found that Coates was not involved in the conspiracy until 1996, adjustments to his criminal history computation are required. Coates's criminal convictions result in a criminal history point total of 4. Coates was released from incarceration for a one year probation revocation in January 1994. Because I lack confidence from the evidence that his involvement in the conspiracy in this case occurred within two years of his release from confinement, I will not add criminal history points under U.S.S.G. § 4A1.1. Accordingly, Coates's total of four criminal history points makes his Criminal History Category score III.

## I. SENTENCING CONCLUSIONS

### 1. Holland

I find that the entire quantity of drugs attributable to the conspiracy were within the scope of Holland's conspiratorial agreement and foreseeable to him. Accordingly, I attribute 53 kilograms of crack and over 30 kilograms of heroin to Holland, resulting in a base offense score of 38 under U.S.S.G. § 2D1.1. Quantities distributed during Holland's incarceration in 1993 are attributable to him.

A four level increase is also appropriate for Holland's leadership role in the organization. A two level increase is appropriate for possession of a firearm during the murder of Antonio Woodson which I find was in furtherance of the jointly undertaken criminal activity of the drug organization. I find that Holland is a career offender

and that the cross reference to § 2A1.1 is appropriate. Accordingly, Holland's base offense level is 43 and his criminal history score is VI.

### 2. Hill

I find that 53 kilograms of crack and over 30 kilograms of heroin are attributable to Hill, resulting in a base offense level of 38.[57] Two level increases are appropriate for possession of a firearm and obstruction of justice, and a four level increase is appropriate for Hill's leadership role in the conspiracy. Additionally, the cross reference to § 2A1.1 applies making Hill's offense level 43. Hill's criminal history category is II.

### 3. Montgomery

I find that Montgomery is a career offender. Accordingly, his offense level is 34 and his criminal history category is VI.

### 4. Carroll

I find that Carroll is a career offender. Accordingly, his offense level is 34 and his criminal history category is VI.

### 5. Jones

I find that 53 kilograms of crack and over 30 kilograms of heroin are attributable to Jones, resulting in a base offense level of 38. Two level increases are appropriate for possession of a firearm and obstruction of justice. Additionally, the cross reference to § 2A1.1 applies making his base offense level 43.

### 6. Deberry

I find that 25 kilograms of crack are attributable to Deberry, resulting in a base offense level of 38. A two level increase is appropriate for possession of a firearm. With total criminal history points of 5, Deberry's criminal history category is III. Thus, Deberry's offense level is 40 and his criminal history category is III.

### 7. Coates

I find that 22.38 grams of crack and 51 grams of heroin are attributable to Coates, resulting in a base offense level of 28. A two level increase is appropriate for possession of a firearm, resulting in an offense level of 30. With a criminal history category III, Coates's sentence range is 121–151 months imprisonment.

## VI. CONCLUSION

For the reasons stated above, the post-trial motions of all defendants are DENIED. At the individual sentencing hearings, after hearing from counsel and the defendants as to any issue, and in particular with respect to any further argument regarding downward departures, I shall impose judgments of sentence as required by law.

---

**57.** Even if I attributed to Hill only the 38 kilograms of crack distributed by the conspirators from May 1992 until Hill's arrest on October 19, 1994, it would make absolutely no difference in his sentence since anything over 1.5 kilograms results in the highest base offense level of 38.